TAMKO ASPHALT PRODUCTS, INC. OF KANSAS (FORMERLY ROYAL BRAND ROOFING, INC.), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3887–78R.    Filed February 15, 1979.

*Jack B. Robertson,* for the petitioner.
*Kevin M. Bagley* and *Genelle F. Schlichting,* for the respondent.

## OPINION

FORRESTER, *Judge:* This is an action for declaratory judgment pursuant to section 7476(a).[1]

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.

Petitioner Tamko Asphalt Products, Inc. of Kansas, formerly Royal Brand Roofing, Inc., filed Form 5301, an Application for Determination for Defined Contribution Plan, on July 30, 1976, with the District Director, Oklahoma City, Okla. Petitioner requested that an administrative determination be made of the qualified status of its profit-sharing plan under the provisions of section 401(a) and the exempt status of its related trust under section 501(a).

On January 27, 1978, respondent issued a Final Adverse Determination Letter stating that the profit-sharing plan of petitioner did not satisfy the vesting requirements resulting from the application of section 401(a)(4) because there has been, or there is reason to believe there will be, an accrual of benefits or forfeitures tending to discriminate in favor of employees who are officers, shareholders, or highly compensated.

Following this final adverse determination, petitioner filed its petition for declaratory judgment with this Court on April 13, 1978. Petitioner also filed, on July 3, 1978, a motion to set case for trial. In response, on August 8, 1978, respondent filed a motion for order to show cause why the case should not be submitted on the administrative record. On August 30, 1978, after a hearing on the motions, petitioner's motion was denied.

The issues presented for our decision are as follows:

(1) Whether petitioner's profit-sharing plan discriminates, or there is reason to believe it will discriminate, in the accrual of benefits or forfeitures, in favor of employees who are officers, shareholders, or highly compensated in violation of section 401(a)(4) and section 411(d)(1)(B); and

(2) Whether this Court erred in refusing to grant petitioner a trial in this case.

This case was submitted for decision on the stipulated administrative record under Rule 122, Tax Court Rules of Practice and Procedure. The administrative record is incorporated herein by reference. Any evidentiary facts or representations contained therein are assumed to be true for the purposes of this proceeding. The following is disclosed from the administrative record.

Petitioner Tamko Asphalt Products, Inc. of Kansas, formerly Royal Brand Roofing, Inc., was incorporated under the laws of the State of Kansas on May 17, 1962, and has its principal place of business at Phillipsburg, Kans. It was a wholly owned subsidiary of Tamko Asphalt Products, Inc. of Missouri. The

latter corporation had a qualified plan for its employees.

On November 29, 1975, petitioner adopted a profit-sharing plan and profit-sharing trust agreement to be effective May 1, 1975. Said plan provided, in relevant part:

## ARTICLE II

### Eligibility and Beneficiaries

2.1 Each employee who has completed one (1) year of service with the employer shall become a participant not later than the earlier of:

(a) The first day of the first plan year beginning after the date on which the employee has completed a year of service.

(b) The date six (6) months after the date on which the employee completed a year of service.

A participant who has at least a one (1) year break in service with the employer and who is re-employed by the employer shall not be eligible to participate until such employee has at least one (1) year of service following re-employment.

\*          \*          \*          \*          \*          \*          \*

## ARTICLE IV

### Allocation of Employer's Contributions

4.1 The employer's contributions for any taxable year shall be allocated among the participants as follows: Each participant shall be allocated one (1) point for each full One Hundred Dollars ($100.00) of the participant's annual compensation earned during the plan year ending after the taxable year for which the contribution is made and two (2) points for each year of service. \* \* \*

4.2 The employer's contribution shall be allocated to each participant in the ratio that the points allocated to each participant bears to the total points allocated to all participants.

\*          \*          \*          \*          \*          \*          \*

## ARTICLE V

### Vesting of Interests

5.1 Each participant shall have a vested interest in his or her account based upon years of service as follows:

| Years of service | Nonforfeitable percentage | Years of service | Nonforfeitable percentage |
|---|---|---|---|
| 5 | 25% | 8 | 40% |
| 6 | 30% | 9 | 45% |
| 7 | 35% | 10 | 50% |

| | | | | |
|---|---|---|---|---|
| 11 | 60% | 14 | | 90% |
| 12 | 70% | 15 or more | | 100% |
| 13 | 80% | | | |

\*   \*   \*   \*   \*   \*   \*

ARTICLE VI

*Benefits*

\*   \*   \*   \*   \*   \*   \*

6.5 \* \* \* that portion of a participant's account that is forfeited because not fully vested shall be allocated to the remaining participants in the ratio that the points allocated to each participant at the time of such forfeiture bears to the total points allocated to all participants at the time of such forfeiture.

In order to qualify this plan under the provisions of section 401(a), and exempt from tax its concomitant trust under section 501(a), petitioner sought a ruling from respondent on these matters. To that end, petitioner submitted Form 5302, Employee Census, for both the parent corporation and petitioner, indicating therein the 25 highest paid participating employees and their status as officers or shareholders for taxable year ending December 31, 1975. Petitioner also tendered respondent a list of its employees for each of the years 1972 through 1975, depicting the respective employee's dates of hiring and termination, number of years of service, and rate of pay.

The employee census reports and employee list formed, in part, a basis for respondent's ruling. An analysis of the employee census reports discloses that the following employees were among the highest paid participants and were either officers or shareholders of petitioner or the parent corporation:

| Employee | Officer or shareholder | Compensation | Years of service | Vested |
|---|---|---|---|---|
| Humphreys, J. P ..... | X | $90,000 | 19 | X |
| Ricketts, J. W ........ | X | 52,000 | 9 | X |
| Allen, R. A ............ | X | 45,500 | 17 | X |
| Kaumans, W. W ...... | X | 28,000 | 15 | X |
| Carder, O .............. | X | 27,000 | 28 | X |
| Ellis, L. F .............., | X | 18,333 | 2 | |
| Humphreys, E. C ..../ | X | 17,000 | 27 | X |
| Plumb, S. V ........... | X | 16,850 | 28 | X |
| Hosp, G. R ............. | X | 16,500 | 27 | X |
| Anderson, M. J ....... | X | 16,000 | 25 | X |
| Average ...................................................... | | | 19.7 | |

Of these employees, W. W. Kaumans was the only one employed by petitioner. In addition, this same employee had the greatest number of total allocated plan units in contrast to petitioner's long term, but less highly compensated employees under the plan, to wit:

| Participants | Years of service | Compensation | Years of service units | Compensation units | Total allocation units |
|---|---|---|---|---|---|
| W. W. Kaumans ....... | 15 | $29,333.36 | 30 | 293 | 323 |
| Melvin R. Gitchel ..... | 15 | 15,556.39 | 30 | 155 | 185 |
| Ernest H. Kearns ..... | 15 | 12,802.96 | 30 | 128 | 158 |
| Albert M. McCormack | 15 | 10,100.65 | 30 | 101 | 131 |
| Daryl D. Snow ......... | 15 | 11,288.97 | 30 | 112 | 142 |
| Robert C. Reese ....... | 16 | 12,599.89 | 32 | 125 | 157 |
| Francis J. Goracke .... | 17 | 11,746.43 | 34 | 117 | 151 |
| Jesse Smith ............. | 17 | 12,736.05 | 34 | 127 | 161 |
| Calvin W. Wisinger ... | 17 | 15,496.49 | 34 | 154 | 188 |
| Jerry D. Hill ........... | 18 | 15,306.55 | 36 | 153 | 189 |
| John T. Novicki ....... | 18 | 6,645.87 | 36 | 66 | 102 |

The record also indicates that the turnover rate for petitioner's rank-and-file employees was 13.43, 19.74, 19.32, 7.06, and 21.16 percent in the respective years of 1972, 1973, 1974, 1975, and 1976, with the average turnover rate of rank-and-file employees for that 5-year period amounting to 16.14 percent. Furthermore, the turnover rate of the parent corporation's employees is essentially no different than the turnover rate of petitioner's employees.

Based upon the information that petitioner furnished respondent, he made a proposed determination on April 12, 1977, that petitioner's profit-sharing plan did not satisfy the requirements of section 401(a) for the tax year ending December 31, 1975. Petitioner appealed the proposed issuance of the adverse determination letter by respondent's District Office to his Regional Office on May 2, 1977. Respondent affirmed the earlier determination and petitioner, on July 7, 1977, appealed this administrative decision to respondent's National Office. After a review of petitioner's request for appeal, respondent chose not to accept it because the position of the Regional Office was not contrary to either the law or the regulations. Thus, respondent's National Office returned petitioner's case to the District Office for issuance of a Final Adverse Determination Letter.

Respondent issued a Final Adverse Determination Letter to petitioner on January 27, 1978. The ruling states, in pertinent part:

We have made this determination for the following reasons:

Article V, section 5.1, of your plan provides for vesting of an employee's accrued benefit attributable to employer contributions in accordance with the "5- to 15-year" vesting standard described in Section 411(a)(2)(B) of the Code. Section 411(d) provides that a plan's vesting schedule which satisfies one of the minimum vesting standards will also be treated as satisfying the nondiscrimination requirements of Section 401(a)(4) unless (A) there has been a pattern of abuse under the plan tending to discriminate in favor of employees who are officers, shareholders, or highly compensated (prohibited group), or (B) there has been, or there is reason to believe there will be, an accrual of benefits or forfeitures tending to discriminate in favor of the prohibited group.

Revenue Procedure 76–11, published in Cumulative Bulletin 1976–1, page 550, provides that a plan's vesting schedule will be treated as satisfying the requirements of Section 401(a)(4) of the Code for purposes of issuing a favorable advance determination letter if (a) the plan satisfies the minimum vesting requirements of Section 411(a)(2), and, in addition, (b) any one of the following conditions is satisfied:

(1) the plan complies with the tests contained in Revenue Procedure 75–49, published in Cumulative Bulletin 1975–2, page 584, either by (i) adoption of 4–40 vesting, or (ii) satisfaction of the "key employee test" or the "turnover test" (whichever test or tests may be applicable); or

(2) in the case of any plan which had previously been the subject of a favorable advance determination letter which has not been revoked, the percentage of vesting of each participant provided under the plan, as amended, is not less (at every point) than that provided under the vesting schedule of the plan upon which the most recent prior determination letter was based; or

(3) there is a demonstration, to the satisfaction of the Service, on the basis of all the facts and circumstances that there has not been, and that there is no reason to believe there will be, an accrual of benefits or forfeitures tending to discriminate in favor of the prohibited group.

Although the vesting schedule in your plan satisfies one of the statutory minimum standards, the plan does not provide vesting as rapid as the 4–40 vesting schedule (see condition (1) above) described in Revenue Procedure 75–49; i.e., 40 percent after 4 years of employment, an additional 5 percent for each of the next 2 years, and an additional 10 percent for each of the following 5 years. Further, you have not demonstrated that the plan satisfies the "key employee test" or the "turnover test" described in Revenue Procedure 75–49. In addition, condition (2) above is not satisfied since your plan has not previously been the subject of a favorable advance determination letter. Condition (3) requires a demonstration that on the basis of the facts and circumstances there has not been, and there is no reason to believe there will be, an accrual of benefits or forfeitures tending to discriminate in favor of the prohibited group. According to the employee turnover schedules which you submitted for years 1972–1976, a significant number of employees in each year terminated employment with less than five years of service.

Consequently, we are not satisfied that on the basis of the facts and circumstances there has not been, and there will not be, an accrual of benefits or forfeitures which discriminate in favor of the prohibited group.

The initial question we must deal with in this action for declaratory judgment is whether petitioner's profit-sharing plan discriminates, or there is reason to believe it will discriminate, in the accrual of benefits or forfeitures, in favor of employees who are officers, shareholders, or highly compensated in violation of section 401(a)(4).[2] Such section provides that a domestic trust forming part of a profit-sharing plan shall constitute a qualified trust if, in addition to meeting the requirements of subsection (a)(1), (2), and (3), the contributions or the benefits provided thereunder do not discriminate in favor of a prohibited group comprised of employees who are officers, shareholders, or highly compensated. Thus, a plan fails to qualify under section 401(a)(4) if it discriminates in favor of a prohibited group of employees. *McMenamy v. Commissioner*, 54 T.C. 1057 (1970), affd. 442 F.2d 359 (8th Cir. 1971).

Pursuant to section 401(a)(7), a trust is not a qualified trust under section 401(a) unless the plan of which such trust is a part satisfies the requirements of section 411. Under that section, minimum vesting standards are prescribed for section 401(a) plans. Moreover, section 411 is coordinated with the nondiscrimination standard of section 401(a)(4) through the operation of section 411(d)(1), which provides the following:

(d) SPECIAL RULES.—

(1) COORDINATION WITH SECTION 401(a)(4).—A plan which satisfies the requirements of this section shall be treated as satisfying any vesting requirements resulting from the application of section 401(a)(4) unless—

(A) there has been a pattern of abuse under the plan (such as a dismissal of employees before their accrued benefits become nonforfeitable) tending to discriminate in favor of employees who are officers, shareholders, or highly compensated, or

---

[2]SEC. 401. QUALIFIED PENSION, PROFIT-SHARING, AND STOCK BONUS PLANS.

(a) REQUIREMENTS FOR QUALIFICATION.—A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section—

*    *    *    *    *    *    *

(4) if the contributions or the benefits provided under the plan do not discriminate in favor of employees who are—

(A) officers,

(B) shareholders, or

(C) highly compensated.

(B) there have been, or there is reason to believe there will be, an accrual of benefits or forfeitures tending to discriminate in favor of employees who are officers, shareholders, or highly compensated.

The parties are in agreement that petitioner's plan, under article V, section 5.1, meets the minimum vesting standards of section 411(a)(2)(B) since it provides for 5- to 15-year vesting of employee participants. Petitioner contends that it also satisfies the requirements of section 411(d)(1)(B). In opposition, respondent argues that petitioner's profit-sharing plan does not fulfill the requirements of section 411(d)(1)(B) and that he is directed by Congress to require more rapid vesting in the event that the requirements of such section have not been met.

In determining whether a plan meets the requirements of section 411(d)(1)(B), respondent tests it under his revenue procedures. It was upon the application of such administrative procedures that petitioner's profit-sharing plan was found to be wanting for lack of compliance with the nondiscrimination standard.

On brief petitioner discussed respondent's revenue procedure in a cursory manner arguing that he was without any power to adopt such procedures. Petitioner cites no legal authority to support its argument and we have found none. To the contrary, we believe that respondent was clearly within his authority, as mandated by Congress, in prescribing certain administrative procedures for the purpose of testing an employee benefit plan against the nondiscrimination standard of section 411(d)(1)(B). See H. Rept. 93-807, 1974-3 C.B. (Supp.) 236, 299; Conf. Rept. 93-1280, 1974-3 C.B. 415, 437. It was from these congressional reports that respondent developed the more rapid vesting standard, which he seeks to apply in this case, commonly known as "4-40" vesting. This vesting standard was discussed by Congress under Conf. Rept. 93-1280, *supra*, 1974-3 C.B. at 437-438:

*Discrimination*

Under the conference substitute the rules of the House bill are adopted with respect to the relationship of the minimum vesting standards of the bill to the antidiscrimination rules of present law (sec. 401(a)(4) of the Internal Revenue Code). In general, a plan which meets the vesting requirements provided in this substitute is not to be considered as discriminatory, insofar as its vesting provisions are concerned, unless there is a pattern of abuse under the plan (such as the firing of employees before their accrued benefits vest) or there has been (or there is reason to believe there will be) an accrual of benefits or

forfeitures tending to discriminate in favor of employees who are officers, shareholders or who are highly compensated.

In the past, however, the law in this area has been administered on a case-by-case basis, without uniform results in fact situations of a similar nature. As a result, except in cases where actual misuse of the plan occurs in operation, the *Internal Revenue Service is directed not to require a vesting schedule more stringent than 40 percent vesting after 4 years of employment* with 5 percent additional vesting for each of the next 2 years, and 10 percent additional vesting for each of the following five years. *Also, this more rapid vesting would generally not be required except in a case where the rate of likely turnover for officers, shareholders, or highly compensated employees was substantially less (perhaps as much as 50 percent less) than the rate of likely turnover for rank-and-file employees.* Of course, where there is a pattern of firing employees to avoid vesting, the limitations described above would not apply. Also, it generally is not intended that any plan (or successor plan of a now existing plan) which is presently under a more rapid vesting schedule should be permitted to cut back its vesting schedule as a result of this statement. [Emphasis supplied.]

Pursuant to these congressional directives, respondent formulated Rev. Proc. 75–49, 1975–2 C.B. 584 and Rev. Proc. 76–11, 1976–1 C.B. 550, in order to implement section 401(a)(4) and section 411(d)(1)(B). Under the latter administrative procedure, the vesting schedule of a plan will satisfy the requirements of section 401(a)(4) for purposes of issuing a favorable advance determination letter if two requirements are met. First, the plan must satisfy the minimum vesting requirements of section 411(a)(2) and, second, at least one of the following conditions must be satisfied under Rev. Proc. 76–11, *supra,* 1976–1 C.B. 550 at sec. 3.01(b):

Sec. 3. Tests for Advance Determination Letters.

        *        *        *        *        *        *        *

(1) the plan complies with the tests contained in Rev. Proc. 75–49, either by (i) adoption of 4–40 vesting, or (ii) satisfaction of the "key employee test" or the "turnover test" (whichever test or tests may be applicable); or

(2) in the case of any plan which had previously been the subject of a favorable advance determination letter which has not been revoked, the percentage of vesting of each participant provided under the plan, as amended is not less (at every point) than that provided under the vesting schedule of the plan upon which such most recent prior determination letter was based; or

(3) there is a demonstration, to the satisfaction of the Service, on the basis of all the facts and circumstances that there has not been, and that there is no reason to believe there will be, an accrual of benefits or forfeitures tending to discriminate in favor of the prohibited group.

Since petitioner meets the minimum vesting standard of

section 411(a)(2)(B)—the 5- to 15-year vesting—the only question is whether petitioner's plan also meets at least one of the three mutually exclusive conditions set out in Rev. Proc. 76–11, *supra* at sec. 3.01(b). Under section 3.01(b)(1) of that revenue procedure, petitioner's profit-sharing plan must comply with the tests contained in Rev. Proc. 75–49, *supra*, either by adoption of 4–40 vesting or by satisfaction of the key employee or the turnover test. We note from the administrative record that petitioner did not meet the 4–40 vesting schedule; consequently, it must satisfy either the key employee test or the turnover test.

Rev. Proc. 75–49, *supra* at sec. 3.02(3), generally provides that if the relevant employment period, defined as the period of consecutive full-calendar months during which an employer has had one or more employees ending with the last month of the pre-application year, exceeds 84 months, then either the requirements of the turnover test or the 4–40 vesting test must be satisfied but not the key employee test. The administrative record discloses that petitioner was incorporated on May 17, 1962, therefore, its relevant employment period exceeds 84 months. This means that the only relevant tests in the instant case are the turnover test and the 4–40 vesting test.

Petitioner contends that the application of the turnover test to its plan will not result in discrimination in favor of a prohibited group. We disagree.

The requirements of the turnover test are satisfied if the rank-and-file turnover rate, meaning the annual rate of turnover for employees other than those in a prohibited group, for the 60-month period ending on the last day of the preapplication year, does not exceed the greater of 6 percent or the applicable percentage of the prohibited group turnover rate for such period. In the instant case, the "applicable percentage" is 200 percent since the number of months in the relevant employment period exceeds 60. See Rev. Proc. 75–49, *supra*, 1975–2 C.B. at 585.

Before the turnover test is applied, however, the relevant employee groups, comprised of rank-and-file and prohibited members, must be determined. As a wholly owned subsidiary, petitioner asserts that only the participating employees in its profit-sharing plan are the pertinent group. Under this analysis, petitioner would have us exclude from the relevant group those employees of the parent corporation who were officers, share-

holders, and highly compensated, since it had a qualified plan of its own which covered this group.

At first blush petitioner's argument seems to make a great deal of sense; nevertheless, section 414(b) and the underlying legislative history refute it. Section 414(b) provides, in pertinent part:

(b) EMPLOYEES OF CONTROLLED GROUP OF CORPORATIONS.—For purposes of sections 401, 410, 411 and 415, all employees of all corporations which are members of a controlled group of corporations (within the meaning of section 1563(a), determined without regard to section 1563(a)(4) and (e)(3)(C)) shall be treated as employed by a single employer. * * *

While this section is not altogether clear on the application of the minimum vesting standards to affiliated employers with multiple plans, the Senate report, which tracks the House report, is support for respondent's position that the employees of the parent corporation and petitioner must be treated as if employed by a single employer.

It provides, in relevant part, at S. Rept. 93–383, 1974–3 C.B. (Supp.) 122:

*Affiliated employers.*—The committee bill also provides that in applying the coverage test, *as well as the antidiscrimination rules and the vesting requirements, employees of all corporations who are members of a "controlled group of corporations"* (within the meaning of sec. 1563(a)) *are to be treated as if they were employees of the same corporation.* Thus, if two or more corporations were members of a parent-subsidiary, brother-sister, or combined controlled group, all of the employees of all of these corporations would have to be taken into account in applying these tests. The committee, by this provision, intends to make it clear that the coverage and antidiscrimination provisions cannot be avoided by operating through separate corporations instead of separate branches of one corporation. For example, if managerial functions were performed through one corporation employing highly compensated personnel, which has a generous pension plan, and assembly-line functions were performed through one or more other corporations employing lower-paid employees, which have less generous plans or no plans at all, this would generally constitute an impermissable discrimination. * * * [Emphasis supplied.]

We believe that a fair reading of section 414(b) would have alerted petitioner to the fact that such section requires, inter alia, that an affiliated group comprised of a parent corporation and its wholly owned subsidiary, each with its own employee benefit plan, must be viewed (when analyzing the plans) as if it were one corporation.

Furthermore, the mere fact that Congress has not passed a

statute to petitioner's liking is not ground for asserting that a "common-sense" approach should prevail. It is well settled that deductions are a matter of legislative grace. *New Colonial Ice Co. v. Helvering,* 292 U.S. 435 (1934); *Harper Oil Co. v. United States,* 425 F.2d 1335 (10th Cir. 1970). In this case, petitioner seeks a deduction and it must be able to point to an applicable statute and demonstrate that it is within its terms. Petitioner fails in this regard. We are in sympathy with petitioner's position, but it must seek reform from Congress instead of the courts.

The congressional purpose that underlies section 414(b) is unclear. It is conceivable Congress believed that variations in vesting schedules between a parent corporation's plan and its subsidiary's plan could be more favorable to the prohibited group which traditionally has a lower turnover rate than the rank-and-file. Because of this variation, the parent corporation's highly compensated employees would enjoy a greater benefit, in the long run, than the subsidiary corporation's rank-and-file. It is also conceivable that Congress believed administrative problems might be greatly multiplied if the treatment of the various employees of a controlled group was different under the minimum vesting standards than under the minimum participation and funding standards. For example, affiliated corporate plans would be required to meet one set or requirements for coverage and funding and another set of demands for vesting. This would place an administrative burden on the corporation as well as the Government.

In any event, it appears that petitioner is attempting to bootstrap its failure to offer any evidence in the administrative record of the parent corporation's rank-and-file employees by arguing that section 414(b) applies only to participating employees in its (the subsidiary's) profit-sharing plan. Petitioner bears the burden of proof in the instant case. Rule 217(c)(1)(i), Tax Court Rules of Practice and Procedure. No evidence was proffered on the turnover rate of the rank-and-file employees of the parent corporation. Furthermore, since the statement was placed in the administrative record that the turnover rate of employees of the parent corporation corresponds to the turnover rate of employees of petitioner, we find that respondent was justified in reaching its administrative determination.

Respondent's determination found that petitioner does not

meet the turnover test of section 3.01(b)(1) of Rev. Proc. 76–11, *supra*. This was based upon the fact that the average turnover rate of the prohibited group was zero percent while the average turnover rate of the rank-and-file was 16.14 percent and since it exceeded the prohibited group's turnover rate, the section 3.01(b)(1) test of Rev. Proc. 76–11, was not satisfied.[3]

In addition to failing the section 3.01(b)(1) test of Rev. Proc. 76–11, we find from the administrative record that petitioner did not satisfy either of the two remaining independent alternative tests under that procedure. The section 3.01(b)(2) test of Rev. Proc. 76–11, will save the day for petitioner only if its profit-sharing plan had previously been the subject of a favorable advance ruling. Since the determination requested was for an initial qualification of the plan for petitioner, the test of section 3.01(b)(2) of Rev. Proc. 76–11, is not met.

Pursuant to section 3.01(b)(3) of Rev. Proc. 76–11, *supra*, there must be a demonstration based upon all the facts and circumstances that there has not been, and there is no reason to believe there will be, an accrual of benefits or forfeitures tending to discriminate in favor of a prohibited group.

As set out earlier in this opinion, the prohibited group members' average length of service was 19.7 years. Of the 10 group members only 1 was not vested. Because the allocation of the employer's contribution to the profit-sharing plan was weighted according to years of service, those employees with longer tenure received proportionately greater amounts of the employer's contributions. See, e.g., *Auner v. United States*, 440 F.2d 516 (7th Cir. 1971). See also *Liberty Machine Works, Inc. v. Commissioner*, 62 T.C. 621 (1974), affd. per curiam 518 F.2d 554 (8th Cir. 1975).

Forfeitures were reallocated on a similar basis. Because of the rapid turnover rate among eligible plan participants who were nonvested, there will be substantial forfeitures of the employer's contributions enriching those vested employees with longer years of service, and, in particular, those members of the prohibited group. This Court has found that the manner in which

---

[3]We also note that petitioner, a fortiori, fails the turnover test suggested in the congressional committee reports. That is, Congress indicated that more rapid vesting would not be required except in a case where the rate of likely turnover for a prohibited group was substantially less (perhaps as much as 50 percent less) than the rate of likely turnover for rank-and-file employees. Conf. Rept. 93–1280, 1974–3 C.B. 437–438. In the case at hand, petitioner's turnover rate for its prohibited group in each year is 100 percent less than the turnover rate for its rank-and-file employees.

forfeitures were reallocated to the remaining participants in a profit-sharing plan was discriminatory since the plan's formula used for allocating them resulted in a consistent pattern of favoring the prohibited group members. *Quality Brands, Inc. v. Commissioner*, 67 T.C. 167, 173 (1976). We believe that the facts and circumstances, as depicted in the entire administrative record, support respondent's affirmative finding that there is reason to believe the accrual of benefits and forfeitures will discriminate in favor of the prohibited group.[4]

After a careful review of the entire administrative record and for all of the above reasons, we hold that petitioner's profit-sharing plan does not satisfy the statutory requirements of section 401(a)(4) and section 411(d)(1)(B) necessary for tax-exempt status under section 501(a). Therefore, respondent's determination that petitioner's profit-sharing plan be denied qualified treatment pursuant to section 401(a) is sustained.

Petitioner further argues that section 7476 "clearly indicates" that it is entitled to a trial as in any other matter before this Court. We do not agree. To permit extrinsic evidence, other than that present in the administrative record, would convert a declaratory judgment proceeding from a judicial review of an administrative determination to a judicial trial de novo. *Houston Lawyer Referral Serv. v. Commissioner*, 69 T.C. 570, 577–578 (1978); *B.S.W. Group, Inc. v. Commissioner*, 70 T.C. 352, 358 n. 3 (1978); Rule 217(a), Tax Court Rules of Practice and Procedure.

Moreover, it is clear that Congress did not expect the Tax Court to conduct a trial de novo and make an independent examination of the facts to determine if the subject plan was qualified. H. Rept. 93–807, 1974–3 C.B. (Supp.) 299, 342–343. See also *Thompson v. Commissioner*, 71 T.C. 32 (1978). We, therefore, hold that this Court did not err when it refused to grant petitioner a trial in the instant case.

*An appropriate decision will be entered.*

---

[4]We do not reach the question raised in petitioner's brief of whether respondent had a sufficient "reason to believe" its plan discriminated in favor of a particular group. Petitioner contends that the phrase "reason to believe," employed in sec. 411(d)(1)(B), means probable cause for believing that an accrual of benefits or forfeitures discriminates in favor of a prohibited group. According to petitioner, since the facts and circumstances hereunder do not support a finding of probable cause, its plan cannot be in violation of sec. 411(d)(1)(B). Petitioner buttresses its contention in a most frivolous

---

manner by relying upon cases that interpret the phrase "reason to believe" under the Immigration and Nationality Act, 8 U.S.C. sec. 1357(a)(4)(1976), which deal with the warrantless arrest power of immigration and naturalization service agents to make such arrests when they have reason to believe the person so arrested is guilty of a felony. Such cases are inapposite to the interpretation of sec. 411(d)(1)(B).

