**TAMKO ASPHALT PRODUCTS, INC. OF KANSAS (Formerly Royal Brand Roofing, Inc.), Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 79–1517.**

United States Court of Appeals, Tenth Circuit.

Argued Nov. 21, 1980.

Decided Aug. 31, 1981.

Rehearing Denied Sept. 24, 1981.

Jack B. Robertson, Kansas City, Mo., for petitioner-appellant.

Daniel F. Ross, Washington, D. C. (M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews and Crombie J. D. Garrett, Attys., Tax Division, Dept. of Justice, Washington, D. C., with him on the brief), for respondent-appellee.

Before McWILLIAMS, McKAY and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

Tamko Asphalt Products, Inc. of Kansas (Tamko) appeals a United States Tax Court decision, 71 T.C. 824, in a declaratory judgment action which upheld the determination of the Internal Revenue Service (IRS or Service) that Tamko's profit sharing trust was not a qualified trust under section 401 of the Internal Revenue Code of 1954 (IRC), 26 U.S.C. § 401, because the plan discriminates in favor of employees who are officers, shareholders, or highly compensated. Tamko challenges the correctness of that determination and the Tax Court's refusal to permit Tamko to introduce additional evidence in the declaratory judgment action to supplement the administrative record.

I

Tamko is a wholly owned subsidiary of Tamko Asphalt Products, Inc., a Missouri corporation (parent). On November 29, 1975, Tamko adopted a profit sharing plan and trust agreement effective for the plan year commencing May 1, 1975. Tamko requested from the IRS an advance ruling on the plan's qualification under IRC § 401. As relevant to issues before us, the plan requires, as a precondition to participation, one year of continuous service with Tamko, its parent, or the parent's other subsidiary.

An employee's interest begins to vest after five years of service, with 25% vesting in the fifth year, 5% incremental increases in each of the next five years, and 10% incremental increases in each of the following five years. An employee's interest, then, fully vests after fifteen years of service. If an employee is terminated before full vesting, the unvested portion of his account is reallocated among the remaining participants in accordance with a formula that gives one point for each $100 of a participant's compensation for that plan year and two points for each year of a participant's service. For purposes of the plan, an employee who is transferred to another plant or subsidiary of the parent is not deemed terminated.

As required by the Commissioner, Tamko submitted a list of employees for the years 1972 through 1976, stating each employee's date of hire, rate of pay, and for those terminated, the date and length of service at termination. The information disclosed that for rank-and-file employees at Tamko the average turnover rate was 16.14%. The turnover rate is significantly less, though still above 6%, if employees with less than one year of service are omitted from the calculation. Tamko employed only one officer, and he had served the company continuously for fifteen years. Tamko submitted other evidence which showed that the parent corporation's officers had similar terms of service averaging 19.7 years. No detailed information was furnished on the rank-and-file employees of the parent or the other subsidiary corporation, but Tamko's submission to the Regional Director stated it "is essentially no different from the tenure and turnover of [Tamko's] employees."

Based on the vesting schedule, the turnover rates among rank-and-file employees and officers, and the reallocation formula, the District Director determined that the plan does not qualify because "there is reason to believe that forfeitures will tend to accrue to members of the prohibited group in a discriminatory manner." The regional office affirmed the determination of the District Director. The national office chose not to accept Tamko's petition for review for reason that the District Director's determination was "not contrary to the law or regulations on the points and issues." The District Director then issued a final adverse determination letter which, in pertinent part, provides the following:

"Article V, section 5.1, of your plan provides for vesting of an employee's accrued benefit attributable to employer contributions in accordance with the '5- to 15-year' vesting standard described in Section 411(a)(2)(B) of the Code. Section 411(d) provides that a plan's vesting schedule which satisfies one of the minimum vesting standards will also be treated as satisfying the nondiscrimination requirements of Section 401(a)(4) unless (A) there has been a pattern of abuse under the plan tending to discriminate in favor of employees who are officers, shareholders, or highly compensated (prohibited group), or (B) there has been, or there is reason to believe there will be, an accrual of benefits or forfeitures tending to discriminate in favor of the prohibited group.

"Revenue Procedure 75–11, published in Cumulative Bulletin 1976–1, page 550, provides that a plan's vesting schedule will be treated as satisfying the requirements of Section 401(a)(4) of the Code for purposes of issuing a favorable advance determination letter if (a) the plan satisfies the minimum vesting requirements of Section 411(a)(2), and, in addition, (b) any one of the following conditions is satisfied:

(1) the plan complies with the tests contained in Revenue Procedure 75–49, published in Cumulative Bulletin 1975–2, page 584, either by (i) adoption of 4–40 vesting, or (ii) satisfaction of the 'key employee test' or the 'turnover test' (whichever test or tests may be applicable); or

(2) in the case of any plan which had previously been the subject of a favorable advance determination letter which has not been revoked, the percentage of vesting of each participant

provided under the plan, as amended, is not less (at every point) than that provided under the vesting schedule of the plan upon which the most recent prior determination letter was based; or

(3) there is a demonstration, to the satisfaction of the Service, on the basis of all the facts and circumstances that there has not been, and that there is no reason to believe there will be, an accrual of benefits or forfeitures tending to discriminate in favor of the prohibited group.

"Although the vesting schedule in your plan satisfies one of the statutory minimum standards, the plan does not provide vesting as rapid as the 4–40 vesting schedule (see condition (1) above) described in Revenue Procedure 75–49; i. e., 40 percent after 4 years of employment, an additional 5 percent for each of the next 2 years, and an additional 10 percent for each of the following 5 years. Further, you have not demonstrated that the plan satisfies the 'key employee test' or the 'turnover test' described in Revenue Procedure 75–49. In addition, condition (2) above is not satisfied since your plan has not previously been the subject of a favorable advance determination letter. Condition (3) requires a demonstration that on the basis of the facts and circumstances there has not been, and there is no reason to believe there will be, an accrual of benefits or forfeitures tending to discriminate in favor of the prohibited group. According to the employee turnover schedules which you submitted for years 1972–1976, a significant number of employees in each year terminated employment with less than five years of service.

"Consequently, we are not satisfied that on the basis of the facts and circumstances there has not been, and there will not be, an accrual of benefits or forfeitures which discriminate in favor of the prohibited group."

As authorized by IRC § 7476, Tamko subsequently filed for a declaratory judgment in Tax Court. The Tax Court refused Tamko's request to be permitted to introduce evidence that was not in the administrative record. The Tax Court later affirmed the IRS determination that there was reason to believe the accrual of benefits would discriminate in favor of the prohibited group of employees.

## II

■ We consider first the ruling denying Tamko permission to introduce evidence in the Tax Court proceeding. IRC § 7476 provides that in a case of actual controversy involving the IRS determination of the qualification of a retirement plan, upon the filing of an appropriate pleading, the Tax Court may make a declaration with respect to the plan's qualification. The Tax Court may not issue such a judgment, however, if the petitioner has not exhausted administrative remedies available within the IRS. *Id.* § 7476(b)(3). Tax Court Rule 217 provides that a declaratory judgment will "ordinarily" be based on the administrative record. Evidence extrinsic to the administrative record may be introduced only if good cause is shown and the court permits it. A note to the rule explains that it is expected the court will determine whether the Commissioner's decision was erroneous upon the basis of the facts the applicant submitted to him. The court will assume that all facts and representations contained in the record are true. *See* Note to Rule 217(a), 68 T.C. 1048 (1978), *reprinted in* [1981] 9 Stand.Fed.Tax Rep. (CCH) ¶ 5824v.

Tamko asserts that utilizing Rule 217 in the context of this case impermissibly limits the jurisdiction of the Tax Court: a court authorized to declare judgments is reduced to one of administrative review. We disagree. Prior to the enactment of the Pension Reform Act of 1974, an employer could not obtain any review of an unfavorable advance determination by the IRS of a retirement plan's qualification. In response to the hardship this created, Congress enacted section 7476. Both the Senate and House committee reports make it clear, however, that a full trial de novo was not contemplated:

"The court is to base its determination upon the reasons provided by the Internal Revenue Service in its notice to the party making the request for a determination, or based upon any new matter which the Service may wish to introduce at the time of the trial. *The Tax Court judgment, however, is to be based upon a redetermination of the Internal Revenue Service determination and not on a general examination of the provisions of the plan or related trust.*"

H.R.Rep.No.93–807, 93d Cong., 2d Sess. 108 (1974), *reprinted in* 1974–3 C.B. 236, 343 (Supp.) (emphasis added). *See* S.Rep.No. 93–383, 93d Cong., 1st Sess. 114 (1973), *reprinted in* 1974–3 C.B. 80, 193, U.S.Code Cong. & Admin.News 1974, pp. 4639, 4773, 4997. That Congress intended only limited review by the Tax Court is supported, too, by the requirement in section 7476 that all administrative remedies be exhausted. To allow the party seeking plan approval to freely bring new evidence before the Tax Court would amount to a bypass of the Service's administrative remedies since the Tax Court would be considering factual contentions the IRS had no opportunity to consider. On the basis of our reading of section 7476 and its legislative history, therefore, we hold that Tamko was not entitled to a trial de novo. *Accord, James E. Thompson, Jr.,* 71 T.C. 32 (1978). *See also Southwest Virginia Professional Standards Review Organization v. United States,* 78–2 U.S.T.C. ¶ 9747 (D.D.C.1978); *Houston Lawyer Referral Service, Inc.,* 69 T.C. 570 (1978).

The additional evidence Tamko urges it should have been permitted to present to the Tax Court consisted only of an update of the employment statistics and explanations of some of the materials in the administrative record. We find that the Tax Court judge did not abuse his discretion in limiting the review to the administrative record.

### III

As to the merits of the Tax Court's affirmation of the IRS ruling that the retirement plan was not qualified, Tamko primarily challenges the Tax Court's inclusion of both Tamko and parent corporation employees in its analysis. Tamko argues that the Tax Court decision was based upon the erroneous premise that officers and shareholders of the parent corporation might benefit from forfeitures under Tamko's plan. Tamko contends the intent of IRC § 414(b) is that the parent and its controlled corporations are to be treated as one. employer "solely for the purpose of determining whether an employee benefit plan discriminates in favor of those who participate in the plan vis-a-vis those who do not participate in the plan." Tamko argues that because its plan has more than 120 participants and only one is a member of the prohibited group, and because other participants had more years of service than that individual the record itself shows no discrimination in favor of the prohibited group. Tamko complains that with only one officer, it could never satisfy the Service's turnover test unless that officer terminated employment every year. Tamko also points out that other IRS offices have given advance approval to the profit-sharing plans of the parent and the other subsidiary corporation and those plans contain the same vesting schedule as Tamko's. Further, Tamko argues that requiring a faster vesting schedule for Tamko than for the others would hamper transfer of employees within the controlled group of corporations.

IRC § 401(a)(7) declares that a trust shall not qualify under that section unless it satisfies the vesting standard requirements of IRC § 411. Section 411(a)(2)(B) generally permits the five to fifteen year vesting schedule adopted by Tamko, but is itself subject to the special rules of section 411(d) that prohibit "an accrual of benefits or forfeitures tending to discriminate in favor of employees who are officers, shareholders, or highly compensated." *Id.* § 411(d)(1)(B). Both sections 401 and 411 are subject to section 414(b)'s requirement that "all employees of all corporations which are members of a controlled group of corporations ... shall be treated as employed by a single employer."

■ Congress expected the IRS to require a plan's benefits to vest more rapidly when the turnover rate of rank-and-file employees is significantly greater than the rate of employees who are officers, shareholders, or highly compensated. *See* Conf. Rep.No.93–1280, 93d Cong., 2d Sess. 276–77 *reprinted in* 1974–3 C.B. 415, 437–38. Accordingly, the IRS promulgated Rev.Proc. 75–49, 1975–2 C.B. 584, and Rev.Proc. 76–11, 1976–1 C.B. 550. The latter provides that to satisfy the nondiscriminatory requirements of section 411(d)(1)(B) sufficiently to warrant a favorable advance ruling, the plan should meet one of the following conditions:

"(1) the plan complies with the tests contained in Rev.Proc. 75–49, either by (i) adoption of 4–40 vesting, or (ii) satisfaction of the 'key employee test' or the 'turnover test' (whichever test or tests may be applicable); or

"(2) in the case of any plan which had previously been the subject of a favorable advance determination letter which has not been revoked, the percentage of vesting of each participant provided under the plan, as amended, is not less (at every point) than that provided under the vesting schedule of the plan upon which such most recent prior determination letter was based; or

"(3) there is a demonstration, to the satisfaction of the Service, on the basis of all the facts and circumstances that there has not been, and that there is no reason to believe there will be, an accrual of benefits or forfeitures tending to discriminate in favor of the prohibited group."

Rev.Proc. 76–11, 1976–1 C.B. 550. Tamko's plan does not vest a 40% interest until the eighth year and therefore does not qualify for the 4–40 safe harbor. The "key employee test" applies only during the first seven years of an employer's existence, *see* Rev. Proc. 75–49, 1975–2 C.B. 584, and Tamko has existed for a longer time. The "turnover test" provides for plan disapproval if the average annual rank-and-file turnover rate for a sixty-month period exceeds the greater of six percent or double the average annual turnover rate of the prohibited

group. *Id.* at 585. The Tax Court concluded that the turnover rate for rank-and-file employees was 16.14%, based on its analysis of the statistics Tamko submitted and on Tamko's representation that the turnover rate at the parent corporation was essentially the same. Whether we look to Tamko alone or include the parent and the other subsidiary, this test is not met. So far as the record shows, the turnover rate for the prohibited group was zero; no members of that group left any of the three organizations' during the five-year period. Even if we accept Tamko's argument that only those with enough service to be participants—one year—should be counted, the turnover rate still exceeds the six percent limitation set forth in Rev.Proc. 75–49. On the basis of these facts, the Tax Court was clearly correct in holding that neither condition of the turnover test was met.

■ The principal purpose of section 414(b) was, it seems clear, to prevent members of a controlled group of corporations from avoiding the law's coverage and antidiscrimination requirements by use of separate corporations. *See* Sen.Rep. 93–383, 93d Cong., 1st Sess. 43–44 (1973), *reprinted in* 1974–3 C.B. 1, 122–123 (Supp.); H.R.Rep. 93–807, 93d Cong., 2d Sess. 50 (1974), *reprinted in* 1974–3 C.B.Supp. 236, 285. The Senate and House reports accompanying the Employee Retirement Income Security Act of 1974 (ERISA) note that the intention is not to require the retirement plans of each corporation in a controlled group to be alike, but that a corporation's retirement plan will qualify so long as it is composed of a fair cross-section of rank-and-file and prohibited group members and its coverage is nondiscriminatory as to the employees of that corporation. *See Id.*

We do not have to decide here whether section 414(b) must be read literally to treat the parent's employees as participants in Tamko's plan even when the plan precludes their participation. Tamko's plan provides that employees who transfer to Tamko from the parent or another subsidiary bring with them for vesting purposes their years of service with any affiliate, and that trans-

fers from Tamko to another plant of the controlled group or to another subsidiary are not regarded as terminations of service. Thus, employees now working for the parent or another subsidiary may benefit from forfeitures under Tamko's plan. In the instant situation, then, it is proper in determining whether Tamko's plan is qualified, to consider the turnover rate of the affiliated corporations.

It matters not that the prohibited group is small in size, nor that some rank-and-file participants with long tenure may benefit even more from forfeitures than the prohibited group. Members of the prohibited group, including the single officer working for Tamko, average more years of service than the rank-and-file participants; their turnover is substantially lower; and the plan's allocation of forfeitures gives extra weight to years of service.

We are bothered by the Service's approval of the plans of the parent corporation and the other subsidiary, with their 5–15 vesting schedules, while the Service disapproved Tamko's nearly identical plan. We would think the appeal to the national office would remedy this kind of inconsistent action by the Service's district and regional directors. Nevertheless, Tamko's only legal argument here is that applying section 414(b) literally, all employees of the controlled corporations are to be treated as employed by a single corporation, and thus, in some manner, the approved plan of the parent or the other subsidiary then becomes the plan of Tamko, giving Tamko an unrevoked advance determination letter within the meaning of Rev.Proc. 76–11, § 3.01(2). Such a holding would be contrary to the legislative history of ERISA which clearly contemplates that affiliated corporations' plans can differ one from the other. *See* S.Rep.No.93–383, H.R.Rep.No.93–807, 93d Cong., 2d Sess. 50 (1974), *reprinted in* 1974–3 C.B. 236, 2851 (Supp.). Nor are, in fact, Tamko's employees covered by the plan of the parent or the other subsidiary. The unrevoked determination letter to which Rev.Proc. 76–11 refers obviously relates to the supercession or amendment of the same corporation's earlier plan, not to

the affiliate's separate though nearly identical plan submitted substantially contemporaneously.

The decision of the Tax Court is AFFIRMED.