*Decisions will be entered under Rule 155.*

Reviewed by the Court.

ROBERT D. SUTHERLAND, D.B.A. SUTHERLAND ROCKY MOUNTAIN LUMBER COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9971–78R.    Filed March 9, 1982.

*George T. Morton,* for the petitioner.
*Stephen J. Morrow,* for the respondent.

OPINION

WILBUR, *Judge*: Respondent determined that during 1976 petitioner's annuity and money-purchase plans failed to meet the minimum participation standards contained in section 410. See sec. 401(a)(3).[1] Pursuant to section 7476, petitioner has invoked the jurisdiction of this Court for a declaratory judgment that its plans satisfy such qualification requirements.[2] The issues for our decision are:

(1) Whether all of the employees of the controlled group of which petitioner is a member must, pursuant to section 414(c),

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended.

[2]The jurisdictional prerequisites have been met: petitioner is the employer whose plan qualifications are at issue (sec. 7476(b)(1)); interested parties have been notified of petitioner's filing of the request for determination (sec. 7476(b)(2)); petitioner's exhaustion of administrative remedies is evidenced by a letter from the National Office of the Internal Revenue Service rejecting petitioner's final appeal from proposed adverse determination letters previously issued by the District Office (sec. 7476(b)(3)); petitioner's plans were both put into effect before this proceeding was instituted (sec. 7476(b)(4)); and a timely petition was filed with this Court on Aug. 28, 1978 (sec. 7476(b)(5)).

be considered together for purposes of determining whether petitioner's plans satisfy the coverage requirements of section 410(b)(1); and

(2) Whether the plans meet the coverage requirements of section 410(b)(1).

This case was submitted under Rule 122, Tax Court Rules of Practice and Procedure. The stipulated administrative record in this case is assumed to be true for purposes of this proceeding.

Petitioner Robert D. Sutherland, doing business as Sutherland Rocky Mountain Lumber Co. (hereafter Rocky Mountain), operates a retail lumber yard and an associated retail store on the same premises at Fort Collins, Colo. Rocky Mountain, a sole proprietorship wholly owned by petitioner, began business operations July 19, 1977.

Sutherland Lumber Co. (not to be confused with Rocky Mountain) is the sponsoring employer of both the "Sutherland Lumber Company Revised Retirement Annuity Plan" (hereafter annuity plan) and the "Sutherland Lumber Company Money-Purchase Pension Plan" (hereafter money-purchase plan), both of which are the subject of this declaratory judgment action. Both plans were amended and restated to conform to the requirements of ERISA on March 11, 1977, with an effective date of January 1, 1976.[3]

Petitioner adopted both the annuity plan and the money-purchase plan on March 11, 1977, with an effective date of January 1, 1976. On April 12, 1977, petitioner filed an application with the St. Louis, Mo., Key District Office of the Internal Revenue Service, requesting a determination with respect to both the annuity plan (Form 5300) and the money-purchase plan (Form 5301).

Participation in both the annuity plan and money-purchase plan is restricted to the salaried employees of the employers maintaining the plans. As of December 31, 1976, petitioner had 16 employees, all salaried. Of petitioner's 16 employees, 10 employees were ineligible to participate in the annuity plan

---

[3]As of Dec. 31, 1975, 25 employers maintained both plans. The amended and restated plans were readopted by the same 25 employers. Additionally, 4 new employers adopted the amended plans bringing to 29 the number of employers maintaining both plans. Petitioner was 1 of 4 employers adopting these plans.

due to the minimum age and 1 year of service requirements. Of the 6 remaining employees, all were eligible, but only 3 chose to participate in the plan. With respect to the money-purchase plan, 7 of petitioner's employees were ineligible to participate due to the 1 year of service requirement. Of the 9 remaining employees, all were eligible and all chose to participate.

As of December 31, 1976, the salaries for petitioner's employees and plan participants were as follows:

| | | Participation | |
| --- | --- | --- | --- |
| Name | 1976 Salary | Annuity plan | Money-purchase plan |
| Harvey | $23,777 | Declined | Participant |
| Nalley | 16,054 | Declined | do. |
| Andler | 15,813 | Participant | do. |
| Kent | 15,152 | Declined | do. |
| Vest | 14,664 | Participant | do. |
| Heldenbrand | 13,129 | Excluded—age | do. |
| Harrison | 12,817 | Participant | do. |
| Hand | 12,496 | Excluded—age | do. |
| Siegrist | 11,565 | Excluded—age | do. |
| Bradley | 9,109 | Excluded—(year of service) | Excluded—(year of service) |
| Martin | 8,811 | do. | do. |
| Parker | 8,420 | do. | do. |
| Peabody | 4,565 | do. | do. |
| Jasmin | 4,059 | do. | do. |
| Welker | 3,813 | do. | do. |
| Rhoads | 3,458 | do. | do. |

Aviation Equities, Ltd. (hereafter Aviation Equities), a Colorado corporation, was organized on January 9, 1975, by petitioner, Gerald Jensen, and Ronald Conquest. Petitioner subscribed for, purchased, and owned 51 percent of the stock of Aviation Equities. Gerald Jensen and Ronald Conquest each owned 24½ percent of the stock of Aviation Equities.

Trans-America Airways, Inc. (hereafter Trans-America), a Colorado corporation, was organized on July 17, 1975. The corporation was a wholly owned subsidiary of Aviation Equities. In 1976, petitioner acquired 100 percent of the stock of Aviation Equities and personally acquired 51 percent of the stock of Trans-America. Ultimately, petitioner acquired the remaining 49 percent of the stock of Trans-America.

Aviation Equities was engaged in the general aviation business, particularly as the major fixed base operator and as

a dealer in Cessna aircraft at Arapahoe Airport, Englewood, Colo. The financial results of the business operations of Aviation Equities and its predecessor, Clinton Aviation Co., were negative. These business operations resulted in net operating losses for each of the years 1975, 1976, 1977, and the portion of 1978 before its operations ceased. The corporation's liabilities exceeded its assets when its operations ceased on October 2, 1978.

Trans-America was engaged in business as an air carrier. Its charter and commuter air carrier operations were based at Stapleton International Airport, Denver, Colo. The financial results of the business operations of Trans-America during the period it conducted business were also negative. Trans-America incurred operating losses for the portion of 1975 after it commenced business, for the year 1976, and for the portion of 1977 before its operations ceased. The corporation's liabilities exceeded its assets when its operations ceased on June 12, 1977.

The retail lumber yard business conducted by petitioner d.b.a. Rocky Mountain has never been related or integrated with any business conducted at any time by Aviation Equities (or its predecessor) or by Trans-America. Their only connection is in having a common owner. By virtue of his ownership interest, petitioner had a major part in selecting the principal executive officers of both Aviation Equities and Trans-America. However, petitioner did not serve as the chief executive officer nor participate in the day-to-day management of either corporation.

Neither Aviation Equities nor Trans-America adopted either the annuity plan or the money-purchase plan. The total number of employees in the controlled group was 124—52 employed by Aviation Equities, 56 employed by Trans-America, and 16 employed by Rocky Mountain. The salary distribution as of December 31, 1976, for the employees of petitioner, Aviation Equities, and Trans-America was as follows:

| Compensation paid | Petitioner | Aviation Equities Trans-America | Total number of employees | Percent |
|---|---|---|---|---|
| $20,000 | 1 | 0 | 1 | 0.8 |
| 16,000–$19,999 | 1 | 2 | 3 | 2.4 |
| 12,000– 15,999 | 6 | 11 | 17 | 13.7 |
| 8,000– 11,999 | 4 | 15 | 19 | 15.3 |

| | | | |
|---|---|---|---|
| $4,000– $7,999 | 2 | 26 | 28 | 22.6 |
| 0– 3,999 | 2 | 54 | 56 | 45.2 |
| Totals | 16 | 108 | 124 | 100.0 |

The compensation of the employees participating in the annuity plan ranged from $12,817 to $15,813. Their average compensation was $14,432. The average compensation of nonparticipating employees (excluding the employees of Aviation Equities and Trans-America) was $10,339.07.

Proposed adverse determination letters were issued on January 23, 1978, by the District Director for the Key District at St. Louis, Mo., with respect to both plans. It was determined that neither plan satisfied the coverage requirements of section 410(b)(1) when the plans were viewed in terms of the control group's being a single employer pursuant to section 414(c). An appeal was taken by petitioner to the Assistant Regional Commissioner by letter dated February 21, 1978. The Assistant Regional Commissioner, by administrative decision dated March 29, 1978, upheld the determination of the District Director that both plans failed to satisfy the requirements of section 410(b)(1). The reasons given were as follows:

Based on the facts of this case, it is determined that those employees making $12,000 or more in compensation are highly compensated. Thus, it is found that in applying the nondiscriminatory coverage test as contained in Section 11.410(b)–1(d)(2) of the Temporary Regulations that the plan covers 100 percent highly compensated employees, while only 18 percent of the total employees of the control group of employers are highly compensated. Since the difference in percentages is not deemed reasonable, it is concluded that the plan does not meet the coverage requirements of Section 410(b)(1)(B) of the Code for the taxable year ending December 31, 1976.[4]

A final appeal was made to the National Office of the Internal Revenue Service by letter dated April 28, 1978. By letter dated May 31, 1978, petitioner's appeal was rejected and the case was returned to the District Director for issuance of a final adverse determination letter.

During the course of the administrative review, including District, Regional, and National Office consideration, the petitioner asserted that both Aviation Equities and Trans-America were failing businesses unable to adopt a pension

---

[4]While this paragraph is in the singular, the same language was used in rejecting both plans.

plan on behalf of their employees. Petitioner contended that the formal existence of common control under section 414(c) should be disregarded for this reason. Petitioner discussed this issue with the examining agent at the District level, and further asserted this issue, on brief, during both Regional and National Office appeals. No corroborating documentation was requested by the respondent, nor presented by the petitioner. Subsequent to the docketing of this case, the petitioner has submitted documentation for the first time, and the parties have stipulated that both aviation businesses lost money throughout their short existences and ceased operations with insufficient assets to meet liabilities.

Section 401(a)(3) provides that in order for a plan to be qualified, it must satisfy the requirements of section 410. Section 410(b)(1) sets forth certain minimum standards relating to the eligibility of employees for coverage under the plan,[5] as follows:

SEC. 410. MINIMUM PARTICIPATION STANDARDS.

(b) ELIGIBILITY.—

(1) IN GENERAL.—A trust shall not constitute a qualified trust under section 401(a) unless the trust, or two or more trusts, or the trust or trusts and annuity plan or plans are designated by the employer as constituting parts of a plan intended to qualify under section 401(a) which benefits either—

(A) 70 percent or more of all employees, or 80 percent or more of all the employees who are eligible to benefit under the plan if 70 percent or more of all the employees are eligible to benefit under the plan, excluding in each case employees who have not satisfied the minimum age and service requirements, if any, prescribed by the plan as a condition of participation, or

(B) such employees as qualify under a classification set up by the employer and found by the Secretary or his delegate not to be discriminatory in favor of employees who are officers, shareholders, or highly compensated.

Section 414(c) provides that for purposes of sections 401(a) and 410 all employees of trades or businesses which are under

---

[5]Respondent's determination as to petitioner's plans was based solely on the coverage requirements of secs. 401(a)(3) and 410(b). Whether a plan discriminates in terms of its contributions and benefits under sec. 401(a)(4) is a separate issue not presently before us. See *Babst Services, Inc. v. Commissioner*, 67 T.C. 131, 136 (1976).

common control shall be treated as if they are employed by a single employer.[6] Whether or not section 414(c) requires aggregation of the employees of Rocky Mountain, Aviation Equities, and Trans-America is for all practical purposes dispositive of this case. For if we focus on Rocky Mountain, alone, the money-purchase plan meets the mathematical coverage test of section 410(b)(1)(A) (9 of the 16 employees met the age and service requirements and all 9 of those employees benefited under the plan), and the annuity plan, while narrowly missing the mathematical coverage test, meets the classification test of section 410(b)(1)(B). (See *infra.*) Conversely, if all 124 employees of the three businesses must be aggregated, petitioner (with only 16 employees) would be unable to meet either test with regard to either plan.

Petitioner recognizes that the trades or businesses conducted by petitioner, Aviation Equities, and Trans-America are business entities formally under common control within the literal language of section 414(c). Nevertheless, petitioner contends that Aviation Equities and Trans-America were rapidly failing businesses that, as a result of consistent losses, were forced to cease operations at a time contemporaneous with the adoption of the plan, the application for a ruling, and the adverse determination by respondent. Consequently, petitioner argues, these corporations were not in good faith able to adopt a permanent plan as required by the law and regulations, and their failure to do what is legally barred should not

---

[6]SEC. 414. DEFINITIONS AND SPECIAL RULES.

(c) EMPLOYEES OF PARTNERSHIPS, PROPRIETORSHIPS, ETC., WHICH ARE UNDER COMMON CONTROL.—For purposes of sections 401, 410, 411, and 415, under regulations prescribed by the Secretary or his delegate, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer. The regulations prescribed under this subsection shall be based on principles similar to the principles which apply in the case of subsection (b).

Sec. 1.410(b)–1(d)(8), Income Tax Regs., provides as follows:

(8) *Certain controlled groups.* In applying the percentage test and classification test described in paragraph (b)(1) and (2) of this section for a year, all the employees of corporations or trades and businesses whose employees are treated as employed by a single employer by reason of section 414(b) or (c) must be taken into account. The preceding sentence shall apply for a plan year if, on 1 day in each quarter of such plan year, such corporations are members of a controlled group of corporations (within the meaning of section 414(b)) or such trades or businesses are under common control (within the meaning of section 414(c)).

disqualify the pension plans in issue.[7]

Respondent agrees that both of the aviation companies lost money from the time they were organized in 1975 through 1977 and 1978 when they ceased operations with insufficient assets to meet their liabilities. He also recognizes that this lack of success resulted in the failure of these businesses. Nevertheless, he argues that there is nothing in the record demonstrating that impending financial disaster precluded Aviation Equities and Trans-America from adopting the Sutherland pension plans along with Rocky Mountain. On the particular (and somewhat unusual) facts before us, we agree with petitioner.

A qualified pension plan must be in writing and communicated to the employees. It is established by an employer "to provide for the livelihood of the employees or their beneficiaries after the retirement of such employees." Sec. 1.401–1(a)(2)(i), Income Tax Regs. The regulations further provide:

(2) The term "plan" implies a permanent as distinguished from a temporary program. Thus, although the employer may reserve the right to change or terminate the plan, and to discontinue contributions thereunder, the abandonment of the plan for any reason other than business necessity within a few years after it has taken effect will be evidence that the plan from its inception was not a bona fide program for the exclusive benefit of employees in general. Especially will this be true if, for example, a pension plan is abandoned soon after pensions have been fully funded for persons in favor of whom discrimination is prohibited under section 401(a). *The permanency of the plan will be indicated by all of the surrounding facts and circumstances, including the likelihood of the employer's ability to continue contributions as provided under the plan.* * * * [Sec. 1.401–1(b)(2), Income Tax Regs. Emphasis added.]

In Rev. Rul. 69–25, 1969–1 C.B. 113, the Service considered this regulation in some detail. That ruling states that when a newly established plan "is first considered for a determination letter" by the Service, the plan is presumed to have been established in good faith as a permanent program, unless there is clear evidence to the contrary in the surrounding facts and circumstances. Abandonment of the plan, unless there have been unforeseen business developments precluding con-

---

[7]Petitioners also argue that sec. 414(c) does not cover businesses unless they are functionally integrated in at least a minimal way. On that point, the record here is strikingly similar to that in *Fujinon Optical, Inc. v. Commissioner,* 76 T.C. 499 (1981), which rejected this argument.

tinuance, reverses this presumption to one of impermanence; in the absence of evidence overcoming this converse presumption, the plan may be disqualified retroactively:

03. When a plan is abandoned within a few years after its adoption, the presumption that it was not a bona fide permanent program for the exclusive benefit of employees in general may be overcome by showing that the abandonment was due to *business necessity that could not reasonably have been foreseen when the plan was adopted.* * * * [Rev. Rul. 69–25, *supra*, 1969–1 C.B. at 113. Emphasis added.][8]

Rocky Mountain adopted both plans on March 11, 1977. Application for a favorable ruling was made on April 12, 1977. Two months later—prior to any response from the Service—Trans-America ceased operations (with insufficient assets to meet its liabilities) after experiencing unremitting losses from its creation in mid–1975 to its demise on June 12, 1977. When the Service issued the final adverse ruling on March 29, 1978, it had been nearly 10 months since Trans-America had ceased operations, and by the time a final appeal by Rocky Mountain was rejected (May 31, 1978), Trans-America had been gone nearly 1 full year. Yet, the adverse ruling took the 108 employees of Trans-America (56) and Aviation Equities (52) into account when it held that the plans discriminate because they cover "100% highly compensated employees while only 18% of the total employees of the control group of employers are highly compensated."

When these words were written, Trans-America had no employees—it had been 10 months since operations ceased. If Trans-America had adopted the plans, and 2 months before its demise applied for a ruling along with Rocky Mountain, its application would have been properly rejected by the Service pursuant to section 1.401–1(b)(2), Income Tax Regulations, and Rev. Rul. 69–25, *supra*. Certainly, it would have been a cruel hoax to "communicate" to the employees of Trans-America that a "permanent plan" was being established for their

---

[8]Internal Revenue Service employees charged with evaluating a plan under these circumstances are advised:

"It becomes your duty to determine whether the plan is intended to be permanent. Although it is impossible to ascertain the true intention of an employer, certainly you should examine his past earnings records to determine his ability to continue future payments to a plan. [IRS Employee Plans Training Program, Training 3145–01 (CCH), at 42 (July 1975 rev.).]"

ultimate retirement. Even if a favorable ruling had been issued to a company no longer in business at the time the favorable action was taken, the Service would have had to retroactively revoke the ruling pursuant to Rev. Rul. 69–25, *supra*, as soon as the "cruel hoax" was discovered.

Our obligation in a declaratory judgment action under section 7476 was explained in both the Senate and House Committee reports:

The court is to base its determination upon the reasons provided by the Internal Revenue Service in its notice to the party making the request for a determination, or based upon any new matter which the Service may wish to introduce at the time of the trial. The Tax Court judgment, however, is to be based upon a redetermination of the Internal Revenue Service determination and not on a general examination of the provisions of the plan or related trust. * * * [H. Rept. 93–807 (1974), 1974–3 C.B. (Supp.) 236, 343; S. Rept. 93–383 (1973), 1974–3 C.B. (Supp.) 80, 193.]

Accordingly, we have focused on respondent's determination, recognizing that his determination may be overturned only if it is demonstrated to be an abuse of discretion, unreasonable, or arbitrary. *Fujinon Optical, Inc. v. Commissioner*, 76 T.C. 499, 506–507 (1981), and the cases cited therein. However, including employees of a corporation in the control group, when that corporation ceased doing business 10 months before the determination was made and could not have applied in good faith for a favorable ruling, is an abuse of discretion, unreasonable, and arbitrary.[9]

There are distinctions between Trans-America and Aviation Equities, but the similarities are sufficient to require similar treatment on the record before us. Aviation Equities was organized on January 9, 1975. Business operations were negative throughout its entire existence, resulting in net operating losses for 1975, 1976, 1977, and that part of 1978 during which it operated.[10] It ceased operations on October 2,

---

[9]The record clearly indicates that the Service was informed of Trans-America's failure months before it issued its proposed adverse determination letter at the District level. By letter dated Aug. 26, 1977, and received by the Service on Aug. 29, 1977, petitioner's attorney informed Kerry Ervin, an Internal Revenue Agent: "As to the Rocky Mountain group, please be advised that one of the members of that group, Trans-America Airlines, Inc., has very recently ceased operations. The company was a failure in the fundamental financial sense."

[10]An independent audit report of Aviation Equities' financial situation prepared by Peat,

1978, shortly after the adverse determination letter was issued and before this case was at issue. While it hung on for a year or so longer than Trans-America, its operational history was strikingly similar. When considered against the entire record herein, including the course of events involving its sister corporation in the aviation business, we believe the employees of Aviation Equities should be similarly excluded.

Respondent has stipulated the facts on which we rely, recognizing that both aviation corporations went from loss to loss to lost. The end came sufficiently close to the events here in issue that the employees of such corporations should be disregarded in applying the provisions of section 414(c). We note that the conclusion we reach is wholly consistent with the legislative history. The circumstances we confront are not even remotely related to the evil Congress apprehended in enacting section 414(c):

The committee, by this provision, intends to make it clear that the coverage and antidiscrimination provisions cannot be avoided by operating through separate corporations instead of separate branches of one corporation. For example, if managerial functions were performed through one corporation employing highly compensated personnel, which has a generous pension plan, and assembly-line functions were performed through one or more other corporations employing lower-paid employees, which have less generous plans or no plans at all, this would generally constitute an impermissible discrimination. * * * [H. Rept. 93–807, *supra*, 1974–3 C.B. (Supp.) at 285; S. Rept. 93–383, *supra*, 1974–3 C.B. (Supp.) at 122.]

Additionally, we must remember that the remedial amendment described was engrafted on legislation enacted over the last four decades with the consistent purpose of encouraging employers to adopt pension plans on behalf of their employees. See, e.g., H. Rept. 2333, 77th Cong., 2d Sess. (1942), 1942–2 C.B. 372, 413, discussing the predecessor of section 410(b) ("The present law endeavors to encourage the setting up of retire-

---

Marwick, Mitchell & Co. for the year ending Dec. 31, 1976, provides some indication of the corporation's bleak financial picture:

"The accompanying balance sheet has been prepared in conformity with generally accepted accounting principles which contemplate continuation of the Company as a going concern; however, the Company has sustained substantial operating losses, which have resulted in a deficiency of stockholders' equity. Continuation as a going concern is dependent upon future profitable operations or obtaining additional financing. We do not express an opinion as to the Company's ability to attain profitable operations and the effect such operations may have on financing requirements."

ment benefits by employers for their employees"); H. Rept. 93–807, *supra*, 1974–3 C.B. (Supp.) at 278, and S. Rept. 93–383, *supra*, 1974–3 C.B. (Supp.) at 118, discussing the minimum age and service conditions, sec. 410(a) ("The committee believes that, in general, it is desirable to have as many employees as possible covered by private pension plans and to begin such coverage as early as possible"). Respondent's harsh position does nothing to advance the purpose Congress had in mind in enacting section 414(c), but does plenty to subvert the overriding purpose of Congress to encourage the establishment of pension plans for employees. The owner of one healthy and two dying businesses has enough impediments to the establishment of a pension plan for the viable concern. If he has to carry two near corpses—possibly finishing them off in the process—he may simply decline to do anything, with the employees of the viable concern being the losers.[11]

We wish to emphasize that we are not holding that the employees of an unprofitable business may be excluded from coverage under a qualified plan merely because the business has significant financial problems. We do hold that the Commissioner acted unreasonably when he insisted on taking into consideration the employees of Trans-America and Aviation Equities, even though Trans-America had gone out of business before he issued the final ruling and even though the circumstances indicated that Aviation Equities was apt to end its business in the near future.

For these reasons, we focus on Rocky Mountain, alone. As noted earlier, focusing on Rocky Mountain, alone, the money-purchase plan meets the mathematical coverage test of section 410(b)(1)(A). While the annuity plan narrowly misses the mathematical coverage test, it meets the classification coverage test requiring that the plan benefit—

---

[11]That the employees of the surviving concern, rather than the employer, bear the brunt of the burden, is attributable to provisions commonly included in plans providing for a return of an employer's contributions if the plan fails to qualify. Thus, petitioner's money-purchase plan provides:

"12.01 *EXCLUSIVE BENEFIT.* * * * Notwithstanding the foregoing provision for impossibility of diversion of Trust assets to an Employer, if the Commissioner of Internal Revenue shall issue an adverse determination upon an Employer's request for initial approval of this Plan, then the Trustee, upon written notice from the Employer(s) affected, shall return the Employer's contributions to the Employer and the Plan and Trust shall thereupon terminate as to that Employer."

such employees as qualify under a classification set up by the employer and found by the Secretary or his delegate not to be discriminatory in favor of employees who are officers, shareholders, or highly compensated. [Sec. 410(b)(1)(B).]

Initially, we note that respondent's designation of a $12,000 salary level for identifying "highly compensated" employees was erroneously based upon an examination of the entire controlled-group population. On brief, respondent explained how the $12,000 figure was selected:

> Based on the facts of this case, the respondent has determined that those employees earning $12,000.00 or more are highly compensated. Out of 124 employees in the controlled group, 21 employees, or 16.9%, earned above $12,000.00. The $12,000.00 figure designated by the respondent as highly compensated is reasonable when it is considered that 54 employees, or 45.2% of the controlled group work force earns below $4,000.00.

However, the annual salary used to identify a highly compensated individual varies from case to case according to the employees included in the relevant employee group. Contrary to respondent's position, we focus on the employees of Rocky Mountain. The salary level for Rocky Mountain employees was generally higher than it was for employees of Trans-America and Aviation Equities. While only 16.9 percent of the "controlled group" employees earned over $12,000, 50 percent of Rocky Mountain employees earned a salary above that figure. Although "highly compensated" is a relative term (*Commissioner v. Pepsi-Cola Niagara Bottling Corp.*, 399 F.2d 390, 393 (2d Cir. 1968), revg. 48 T.C. 75 (1967)), we certainly do not believe that the term "relative" is to be taken to such extreme as to automatically label the top half of the employee group as highly compensated.

As of December 31, 1976, the salaries for Rocky Mountain's employees and annuity plan participants were as follows:

| Name | 1976 Salary | Participation |
| --- | --- | --- |
| Harvey | $23,777 | Declined |
| Nalley | 16,054 | Declined |
| Andler | 15,813 | Participant |
| Kent | 15,152 | Declined |
| Vest | 14,664 | Participant |
| Heldenbrand | 13,129 | Excluded—age |
| Harrison | 12,817 | Participant |

| Hand | $12,496 | Excluded—age |
|---|---|---|
| Siegrist | 11,565 | Excluded—age |
| Bradley | 9,109 | Excluded— (year of service) |
| Martin | 8,811 | do. |
| Parker | 8,420 | do. |
| Peabody | 4,545 | do. |
| Jasmin | 4,059 | do. |
| Welker | 3,813 | do. |
| Rhoads | 3,458 | do. |

We think that $15,000 is an appropriate dividing line for identifying highly compensated employees with respect to the above group.[12] Of the 16 Rocky Mountain employees, 4 (Harvey, Nalley, Andler, and Kent) would be considered highly compensated (25 percent). We think this benchmark is reasonable especially when it is considered that respondent determined that only 16.9 percent are highly compensated with reference to the controlled group as a whole.[13]

Various guidelines have been suggested by the committee reports, regulations, and courts in determining whether a plan discriminates in favor of the prohibited group. In the instant case, the Commissioner applied the test contained in then-temporary section 11.410(b)–1(d)(2), Income Tax Regs.:

(2) *Discrimination.* The determination as to whether a plan discriminates in favor of employees who are officers, shareholders, or highly compensated is made on the basis of the facts and circumstances of each case, allowing a reasonable difference between the percentage of such employees benefited by the plan to all employees benefited by the plan and the percentage of all such employees of the employer to all employees of the employer. * * *

Applying this test, while 25 percent of all Rocky Mountain

---

[12]The respondent's selection of the dividing line for identifying highly compensated employees should generally be accepted unless it is arbitrary. See *Commissioner v. Pepsi-Cola Niagara Bottling Corp.*, 399 F.2d 390, 393 (2d Cir. 1968), revg. 48 T.C. 75 (1961). However, the respondent's selection of $12,000 to identify highly compensated employees was based on an erroneous assumption as to the relevant employee group. Consequently, we must make a de novo determination as to the appropriate salary level of demarcation. Compare *Tamko Asphalt Products, Inc. of Kansas v. Commissioner*, 658 F.2d 735 (10th Cir. 1981), affg. 71 T.C. 824 (1979).

[13]In *Fujinon Optical, Inc. v. Commissioner*, 76 T.C. 499 (1981), we accepted respondent's determination that 24 employees were "highly compensated," a category which accounted for approximately 15 percent of the total employee population.

employees were "highly compensated" (1:4), only 33.3 percent of the employees benefiting were "highly compensated" (1:3). This hardly constitutes discrimination *in favor of* the prohibited group.

The current regulations contain a similar test allowing "a reasonable difference" between the percentage of "highly compensated" employees covered and the percentage of the remaining employees covered. (See sec. 1.410(b)–1(d)(2), Income Tax Regs.) Focusing on this test, the difference in participation levels between prohibited group and nonprohibited group employees was insignificant. Of the 12 Rocky Mountain employees having annual salaries below $15,000, a category which accounted for 75 percent of the employees, 2 employees were covered by the annuity plan (1:6). On the other hand, of the 4 employees having annual salaries above $15,000, only 1 employee was covered (1:4). We believe this is a reasonable differential within the meaning of this regulation.

Concededly, an argument can be made that the annuity plan does not cover a "fair cross-section" of Rocky Mountain employees. Unlike the guidelines outlined by the regulations (sec. 1.410(b)–1(d)(2)), the fair cross-section approach would seem to require some participation among middle- and low-paid employees.[14] See Rev. Rul. 70–200, 1970–1 C.B. 101. While the annuity plan does cover employees in the middle compensation range (Vest and Harrison), the 9 least-compensated employees did not participate. Results under the fair cross-section test *alone* are not conclusive. For as we stated in *Federal Land Bank Association of Asheville v. Commissioner*, 74 T.C. 1106, 1114 (1980):

> Neither the statute, nor the regulations, however, provide that an employer's plan must satisfy *independently* the fair cross-section test to qualify under section 401(a). Section 401(a)(3)(B) provides that a plan shall not set up a classification of employees discriminatory in favor of the prohibited group; it does not require that a plan include a fair cross-section of the employees eligible to participate. Moreover, section 1.401–1(b)(3),

---

[14]However, one of the criteria suggested by the Committee reports in determining whether the plan covers a fair cross-section of high- and low-paid employees is whether "the average compensation of covered employees was substantially higher in that plan than the average compensation of noncovered employees." H. Rept. 93–807, 1974–3 C.B. (Supp.) 236, 285. The average salary of Rocky Mountain employees who participated in the annuity plan ($14,431.33) was not "significantly higher" than the average salary of nonparticipants ($10,339.07).

Income Tax Regs., provides that the plan must "benefit the employees in general" rather than serve as a subterfuge for the distribution of profits to shareholders. Although the failure of a plan to include a fair cross-section of employees *may* indicate that such plan discriminates in favor of the prohibited group, a plan does not necessarily discriminate because it fails to satisfy the fair cross-section test. Discrimination in favor of the prohibited group must exist *independent* of whether a fair cross-section of eligible employees elect to participate in a plan. [Emphasis in original and added.]

In *Federal Land Bank*, only 2 of the employer's 23 eligible employees had elected to participate; 1 was highly compensated, the other was not. Although the plan did not cover a fair cross-section of employees, we held that the coverage of the plan was nondiscriminatory because (1) the plan was open to all full-time employees who met certain minimal service requirements, (2) the participation rate of prohibited-group members was low (50 percent), and (3) the difference in the participation levels between prohibited-group (1:9) and non-prohibited-group employees (1:14) was insignificant. 74 T.C. at 1117.

As demonstrated, all of these factors are present here. Additionally, 3 of 4 highly compensated employees declined participation and the difference in participation levels between the two groups was insignificant. This indicates quite clearly that when "all the facts and circumstances are considered," the plan did not favor the prohibited group.[15]

We thus conclude that respondent abused his discretion in determining that petitioner's money-purchase and annuity plans were not qualified under section 401(a). Accordingly,

*Decision will be entered for the petitioner.*

---

[15]We recognize that the "classification set up by the employer" in this case restricted eligibility to salaried employees. But the "salaried only" classification did not operate to exclude any of the Rocky Mountain employees from participating in the annuity plan since *all* 16 Rocky Mountain employees were salaried. None were excluded because they were hourly paid. Cf. *Liberty Machine Works, Inc. v. Commissioner*, 62 T.C. 621, 631–632 (1974) (salaried only classification which operated to exclude a significant number of lower-paid hourly employees found to be discriminatory).