PROFESSIONAL & EXECUTIVE LEASING, INC., PETITIONER
v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 18547-86R.          Filed August 3, 1987.

*Thomas G. Walker, Jr.,* for the petitioner.
*Paul S. Horn,* for the respondent.

OPINION

STERRETT, *Chief Judge*: This case is before the Court upon a petition for declaratory judgment pursuant to section 7476[1] and Rule 211 alleging that petitioner's pension and profit-sharing plans qualify under section 401(a). The case was submitted without trial on the basis of the pleadings and the facts recited in the jointly stipulated administrative record filed with the Court on September 9, 1986.

The issue presented for our decision is whether petitioner's pension and profit-sharing plans fail to qualify under

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

section 401(a) because such plans cover individuals who are not employees of petitioner.

The administrative record is incorporated herein by reference. Any evidentiary facts or representations contained therein are assumed to be true for the purposes of this proceeding. The following facts relevant to our decision are drawn from the administrative record.

Petitioner Professional & Executive Leasing, Inc., is a corporation organized under the laws of Idaho and has its principal place of business at 184 Second Street West, Twin Falls, Idaho. Petitioner submitted to respondent its defined benefit plans and money purchase plans for determination during 1984 and 1985. On or about February 24, 1984, a request for determination with respect to the qualified status of the Rodney D. Swartling, M.D., Money Purchase Pension Plan & Trust Agreement was filed with the District Director in Seattle, Washington.[2] On or about April 23, 1984, a request for determination with respect to the qualified status of the Rodney D. Swartling, Defined Benefit Plan was filed with respondent. On or about March 19, 1985, a request for determination as to amendments to both the Rodney D. Swartling, M.D., Money Purchase Pension Plan & Trust Agreement and the Rodney D. Swartling, Defined Benefit Plan were filed with respondent.

Petitioner describes itself in its promotional materials (under its prior name of MAS Enterprises, Inc.) as a corporation organized primarily for the purpose of leasing management personnel to commercial businesses and licensed professionals to operating professional practices. Its promotional materials describe the benefits of its program as follows:

Since its inception on November 1, 1982, MAS Enterprises has been able to obtain significant discounts in the purchase of various insurance products. In addition, MAS Enterprises continues to seek out providers of goods and services willing to take into consideration the benefits of selling to a large up-scale group.

---

[2]The May 27, 1986, final adverse determination letter covered 120 plans. Due to the numerous identical plans with different effective dates adopted by petitioner for various individuals, and by agreement of the parties, the administrative record in this case consists of the materials applicable to the representative defined benefit plan and the representative money purchase plan with respect to Dr. Rodney D. Swartling. The term "administrative record" is defined in Rule 210(b)(11).

Further, as an employee of MAS Enterprises, the small business manager or professional practitioner can obtain a very liberal fringe benefit package and retirement plan for himself. Since each individual subscribing to the leasing program will be, for all purposes, an employee of MAS Enterprises, he will be eligible to participate in all of the leasing company's benefit programs. Other employees of the operating entity or practice will not be covered under these programs, but rather will continue to be covered under the benefit programs, if any, made available by the operating company or practice entity. MAS Enterprises has established an extremely flexible benefit package which enables each employee to have his program tailored to his particular needs and desires.

The individuals covered by petitioner's plans are professionals and executives consisting of medical doctors, lawyers, dentists, veterinarians, and business operators. Petitioner has entered into an arrangement entitled "Contract of Employment" (COE) with these individuals (workers).[3] Petitioner has also entered into an arrangement with the operating businesses and professional practices (recipients) for which the workers provide their services entitled "Personnel Lease Contract" (PLC).

Workers under a COE with petitioner participate in a money purchase pension plan, a defined benefit plan, and an extensive fringe benefit program as adopted by petitioner for that worker. The money purchase pension plans provide for: (1) A nonintegrated employer contribution equal to $7\frac{1}{2}$ percent of covered compensation; (2) immediate participation; and (3) full and immediate vesting. The defined benefit plans provide for contributions determined in accordance with generally accepted actuarial principles. Contributions have been made each year in accordance with the terms of the plans.

The fringe benefit program in effect as of November 1983 permitted workers to elect to participate in a financial planning and asset management program, group health and accident insurance, a medical expense payment and reimbursement plan, life insurance, disability insurance, prepaid group legal services, dependent care assistance, athletic and health club membership, survivor's death benefit, vacation pay, and severance pay.

---

[3]Because the issue in this case is whether individuals who entered into these "Contracts of Employment" with petitioner are, in fact, "employees" of petitioner, we will refer to such individuals in our discussion herein by the neutral term "workers" and will refer to the entities using the services of such workers as "recipients." See sec. 414(n).

The COE allows workers the option to defer the payment for their services which they provide to the recipients. Workers are given the opportunity under the COE to take purported loans from petitioner, the security for which consists of the workers' future or deferred compensation.[4] Petitioner prepares the workers' paychecks and withholds Federal and State income taxes and pays Social Security and Federal unemployment taxes for each worker. In addition, petitioner pays workmen's compensation premiums and State unemployment insurance premiums on behalf of all workers.

On August 24, 1984, petitioner had 52 workers in COE arrangements.[5] In August 1985, petitioner had 73 workers in COE arrangements. As of November 19, 1985, petitioner had 61 workers in COE arrangements. Of the 73 workers in a COE arrangement in August 1985, almost all had a preexisting ownership or equity interest in the recipient to which they were "leased."[6] The PLC provides that, if any worker was employed by a recipient prior to execution of the PLC, the employer-employee relationship shall be definitely terminated prior to the contract's effective date. Each of the workers with a prior ownership or equity interest provided services to the same recipient for which the worker previously performed services. No worker having an equity or ownership interest in a recipient performed services for any other recipient.

The only review of the qualifications of the workers that petitioner undertakes is to determine whether the workers are licensed under State or local law to engage in their

---

[4]The Schedule of Compensation of the COE states that the worker shall be paid once each year during the term of the contract and that such payment shall be made on or before Dec. 31. It also provides that the worker shall have the right to obtain loans from petitioner which shall be repaid on or before Dec. 31 of each year.

[5]The workers included 36 medical doctors, 3 lawyers, 1 dentist, 2 veterinarians, and 10 independent consultants and executives.

[6]Of the 52 workers under contract on Aug. 24, 1984, all but 3 were former employees of the recipients to which they were "leased" and all but 4 had an ownership or equity interest in the recipient to which they were leased. During a conference on Nov. 19, 1986, petitioner's representative told respondent's representatives that he had been mistaken and that of the total 73 workers that had participated in the leasing program, 55 had not been leased back to the entity by which they previously had been employed. Petitioner explained this discrepancy by stating that many of the workers reorganized their professional corporations and/or partnerships for which they had worked at the time the COE's and PLC's were signed. Thus, a new legal entity came into existence to lease its owner back from petitioner.

The stock in petitioner is not owned, directly or indirectly, by any worker except Thomas G. Walker, Jr., who is the sole shareholder.

particular professions or businesses. Petitioner retains the apparent right under the COE to terminate a worker's services or reassign a worker to another recipient. Petitioner has terminated the services of one worker but has made no reassignments. The PLC provides that petitioner and the recipient may, at any time, increase or decrease the compensation paid to a worker for the provision of his services. The COE provides that petitioner and the worker may, at any time, increase or decrease the worker's compensation.

Recipients provide the equipment, tools, and office space for the workers. In appropriate instances, the PLC requires that the recipient furnish the worker with malpractice insurance and that petitioner be named as an insured.

Under the PLC, the recipient agrees to pay a setup fee of $1,500 for each position staffed by petitioner and a service rate payment of $110 per month for each position staffed. In addition, the recipient agrees to pay petitioner the compensation for the workers in accordance with a schedule of compensation adopted for each worker.

The COE provides that the worker shall not have the right to make any representations on behalf of or to bind petitioner to any contract, obligation, or transaction, but no such restriction applies to the worker vis-a-vis the recipient. The COE provides that petitioner shall not infringe on the worker's exercise of his professional judgment in rendering services to the public. Each worker controls the details of his or her performance of services, including selection of assignments. Petitioner or the worker may terminate the COE by giving the other party written notice.

On May 27, 1986, respondent issued a final adverse determination letter for the plan years ended October 31, 1982, 1983, 1984, and 1985 with respect to the Rodney D. Swartling, M.D., Money Purchase Pension Plan & Trust Agreement, the Rodney D. Swartling, Defined Benefit Plan, and the other defined benefit plans and the money purchase plans adopted by petitioner for the other workers.

Petitioner has notified all interested parties pursuant to section 7476(b)(2) and has exhausted all available administrative remedies within the Internal Revenue Service pursuant to section 7476(b)(3). Petitioner's defined benefit plans

and money purchase plans have been put into effect within the meaning of section 7476(b)(4). Petitioner timely commenced this declaratory judgment action on June 9, 1986.

Respondent determined in his final adverse determination letter of May 27, 1986, that petitioner's money purchase plans and defined benefit plans do not meet the requirements of section 401. The basis of respondent's determination is that a worker who performs services pursuant to petitioner's leasing arrangement is not an "employee" of petitioner. Therefore, respondent concludes that petitioner's plans violate the "exclusive benefit" requirement of section 401(a)(2).[7] See also secs. 1.401-1(a)(3)(ii) and 1.401-1(b)(3), Income Tax Regs.

In order to be entitled to tax-exempt status under section 501(a), a retirement plan[8] must meet all the requirements of section 401(a). That section provides in relevant part as follows:

SEC. 401. QUALIFIED PENSION, PROFIT-SHARING, AND STOCK BONUS PLANS.

(a) REQUIREMENTS FOR QUALIFICATION.—A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section— * * *

(2) if under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be (within the taxable year or thereafter) used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries * * *

It is respondent's position that the plans in issue here fail to establish the existence of an employer-employee relation-

---

[7]Petitioner states on brief that it—

"is not arguing that §414(n)(5) of the Code is applicable regardless of the employment status of the Leased Employees. Petitioner merely submits that because Petitioner's Leased Employees are its common-law employees, the safe harbor provisions created by §414(n)(5) of the Code apply."

We interpret this statement as a concession. Therefore, despite respondent's treatment of this legal issue in the Technical Advice Memorandum accompanying the May 27, 1986, adverse determination letter and on brief, we do not address the question whether the safe harbor provisions of sec. 414(n)(5) apply even though the workers are not common law employees of petitioner.

[8]We use the term "retirement plan" in its generic sense to include the money purchase pension plans and defined benefit plans at issue here.

ship between petitioner and the workers. Rather, respondent maintains that the workers either remain self-employed or employees of their own professional service corporations for which they worked before, and continued to work after, entering into the purported leasing arrangement with petitioner. Specifically, respondent argues that the form of the COE and the PLC does not reflect the substance of the relationships among the parties.[9]

Petitioner argues to the contrary that a valid employment relationship exists between petitioner and the workers and that the dealings among the workers, petitioner, and the recipients are governed by the terms of the COE and the PLC. Petitioner bears the burden of proving that respondent's adverse determination is in error. Rule 217(c)(1)(i). In reviewing respondent's determination, we must look solely to the evidence contained in the administrative record. *Tamko Asphalt Products, Inc. v. Commissioner*, 71 T.C. 824, 837 (1979), affd. 658 F.2d 735, 738-739 (10th Cir. 1981); Rule 217(a).

To determine the existence of an employer-employee relationship we must look to common law concepts.[10] See *Edward L. Burnetta, O.D., P.A. v. Commissioner*, 68 T.C. 387, 397 (1977); *Packard v. Commissioner*, 63 T.C. 621, 629 (1975). Sec. 31.3121(d)-1(c)(2), Employment Tax Regs., defines the common law employer-employee relationship as follows:

(2) Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is

---

[9]On brief, respondent describes the arrangement herein as a "blatant attempt to circumvent the coverage and antidiscrimination rules" of secs. 401 and 410. This ground was not relied on by respondent in his adverse determination letter. If this were purely a legal ground, the Court would consider it and respondent would bear the burden of proof with respect to it. Rule 217(c)(1)(ii). However, such ground has significant factual elements which do not appear in the record. Therefore, we do not address it. See *Ralph Gano Miller Corp. v. Commissioner*, 76 T.C. 433, 436 (1981).

We also note that despite petitioner's lengthy treatment of certain perceived issues on brief, respondent does not challenge petitioner's existence as a viable corporate entity or pursue an assignment of income theory.

[10]In defining the term "employee" for self-employment tax purposes, sec. 1402(d) refers us to sec. 3121(d) which defines the term for purposes of the Federal Insurance Contributions Act. Sec. 3121(d)(2) provides that the term "employee" means "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee."

accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. * * *

Section 220 of 1 Restatement, Agency 2d (1958), provides a similar definition:

A servant [employee] is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.

Whether or not an employer-employee relationship exists is a question which must be determined on the basis of the specific facts and circumstances involved. *Simpson v. Commissioner*, 64 T.C. 974, 984 (1975); *Ellison v. Commissioner*, 55 T.C. 142, 152 (1970); *Hand v. Commissioner*, 16 T.C. 1410, 1414 (1951). Sec. 31.3121(d)-1(c)(3), Employment Tax Regs. While the cases which deal with the common law factors usually involve a determination of whether a person is an employee or an independent contractor, the principles are equally applicable to determine by whom an individual is employed.[11] See *Bartels v. Birmingham*, 332 U.S. 126, 132 (1947).

Among the factors to which the courts have looked in determining the existence of an employment relationship are the following: (1) The degree of control exercised over the details of the work; (2) investment in the work facilities; (3) opportunity for profit or loss; (4) whether the type of work is part of the principal's regular business; (5) right to discharge; (6) permanency of the relationship; and (7) the relationship the parties think they are creating. *United States v. Silk*, 331 U.S. 704, 716 (1947); *Simpson v. Commissioner, supra* at 985; *Ellison v. Commissioner, supra* at 153. Although no one factor is controlling, the test usually considered fundamental is "whether the person for whom the work is performed has the right to control the activities of the individuals whose status is in issue, not only as to results but also as to the means and method to

---

[11]Sec. 31.3401(c)-1(c), Employment Tax Regs., provides that generally "physicians, lawyers, dentists, veterinarians, * * * and others who follow an independent trade, business or profession in which they offer their services to the public, are not employees." Rather, such professionals are generally regarded as self-employed where they hold themselves out to the public in their individual capacities. Where, however, professionals have established their own professional operating practices, they may be regarded as employees of such entities.

be used for accomplishing the result." *Packard v. Commissioner, supra* at 629; see also *Alsco Storm Windows, Inc. v. United States*, 311 F.2d 341, 343 (9th Cir. 1962).

A contract purporting to create an employer-employee relationship will not control where the common law factors (as applied to the facts and circumstances) establish that the relationship does not exist. In *Bartels v. Birmingham, supra*, the Supreme Court was asked to determine whether certain orchestra members were employees of the orchestra leader or of the operators of various dance halls where they performed. After applying the common law rules to the facts of the case, the Court held that the orchestra leader was the employer (and therefore responsible for the employment tax) despite the formal contractual agreement designating the proprietors of the dance halls as the employers. Similarly, in *Edward L. Burnetta, O.D., P.A. v. Commissioner, supra*, this Court held that certain individuals who worked in the offices of two professional corporations were the common law employees of those corporations rather than of a separate payroll service corporation that maintained the workers' records and issued their paychecks.

An application of the relevant common law factors to the facts disclosed by the administrative record demonstrates the absence of the requisite employer-employee relationship. Pervading a consideration of all the relevant factors as they apply herein is the fact that almost all of the workers had an ownership or equity interest in the recipient for which they provided services.

First, petitioner exercised minimal, if any, control over the workers. As noted, the workers were "assigned" to perform services for the entity in which each had a preexisting ownership or equity interest. The COE purports to give petitioner exclusive control over the workers including the authority to reassign workers to other recipients.[12] However, it strains credulity to believe that a worker would comply with an assignment to a recipient in which he had

---

[12]The COE provides that:

"The [worker] shall be under the exclusive charge and control of the [petitioner] and shall not be subject to the control of the Recipient, excepting as to results. The [petitioner] shall have the sole and exclusive right to discharge the [worker]. * * *

"* * * the [worker] agrees that the [petitioner] shall have the sole and exclusive discretion to determine the Recipient to which [the worker] will be assigned."

234

no interest. Rather, the worker would merely terminate his relationship with petitioner and continue working for his professional corporation or other entity.

In addition, each recipient and the worker controlled the details of when and how work was to be performed as well as the selection of assignments. Most of the workers were professionals and obviously petitioner was unqualified to supervise or evaluate the performance of professional services. While we are cognizant that the alleged employer need not "stand over the employee and direct every move that he makes" (*Atlantic Coast Life Ins. Co. v. United States*, 76 F. Supp. 627, 630 (E.D. S.C. 1948); *Simpson v. Commissioner, supra* at 985), and that an employer's control over the manner in which professional employees conduct the duties of their positions "must necessarily be more tenuous and general than the control over nonprofessional employees" (*James v. Commissioner*, 25 T.C. 1296, 1301 (1956)), we remain unpersuaded that even a "tenuous and general" control exists in the case before us. See also *Azad v. United States*, 388 F.2d 74, 77 (8th Cir. 1968). Rather, it is apparent that the recipient and the worker control the terms of the arrangement.

Second, petitioner has no investment in the work facilities. The recipients provide the office space as well as all necessary tools and equipment. Third, petitioner has no opportunity for profit or loss except for the amounts received from the recipient as a setup fee and monthly service rate payments. The profit earned from the efforts of the worker in the recipient's business belongs solely to the recipient. Fourth, like petitioner's purported right to reassign workers, petitioner's right to discharge workers as provided by the COE is, in the context of the worker's equity interest in the recipient, illusory. Finally, while the parties have labeled the arrangement created by the COE and PLC as an employment relationship between petitioner and the worker, the objective economic reality of the relationship is that petitioner merely performs a bookkeeping and payroll service function, while the worker remains either self-employed or the employee of the recipient.[13] The

---

[13]Clearly, the workers were not dependent on petitioner for their compensation because the source of their income was the recipient whose interests were coextensive with those of the

existence of a contract specifying that an employer-employee relationship exists is only one factor to be considered. *Bartels v. Birmingham, supra* at 129. In accordance with long-established precedent, we find that the transactions embodied in the COE and PLC lack objective economic substance and are not controlling for tax purposes. See *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978); *Knetsch v. United States*, 364 U.S. 361, 367 (1960); *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945); *Falsetti v. Commissioner*, 85 T.C. 332, 347 (1985).

Thus, after a careful review of the administrative record and for the reasons discussed above, we hold that the workers are not common law employees of petitioner. Therefore, petitioner's plans do not meet the "exclusive benefit" rule of section 401(a)(2). Accordingly, respondent's determination that petitioner's plans be denied qualified treatment pursuant to section 401(a) is sustained.[14]

*An appropriate decision will be entered.*

---

worker. We note, however, that petitioner was, nevertheless, responsible for withholding Federal employment taxes for the workers because it had control of the payment of the wages. See *Otte v. United States*, 419 U.S. 43, 50-51 (1974).

[14]While the record suggests that there may be a few workers who do not own equity or ownership interests in the recipients to which they are leased, no facts appear in the administrative record which would permit a different conclusion with regard to the application of the common law factors as to them. Thus, our decision herein must result in the disqualification of all the plans submitted for determination.