T.C. Memo. 1996-389


UNITED STATES TAX COURT


PAUL E. HATHAWAY AND BRENDA J. HATHAWAY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 19122-93.                    Filed August 21, 1996.


        Petitioner husband (P) was a traveling sales
representative in 1989 and 1990 for a company that
manufactured and distributed men's clothing (T).  T did
not control, and did not have the right to control, the
manner or means by which P solicited sales.  P had a
substantial investment in facilities and bore
substantially all the expenses of his sales activities.
P also bore the risk of loss from his sales activities.
P and T had a permanent working relationship, although
terminable at the will of either party.  P received
employee-type benefits from T.

        <u>Held</u>:  P was an independent contractor and was not
an employee in 1989 and 1990.  Sec. 62(a)(1), I.R.C.
1986.


<u>Walter T. Hart</u>, for petitioners.

<u>Jeffrey A. Schlei</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHABOT, Judge:  Respondent determined deficiencies in Federal individual income tax[1] against petitioners as follows:

| Year | Deficiency |
| --- | --- |
| 1989 | $10,286 |
| 1990 | 11,652 |

After concessions by both sides,[2] the issue for decision is whether petitioner Paul E. Hathaway, hereinafter sometimes referred to as Hathaway, a traveling sales representative, was a common law employee, a statutory employee, or an independent contractor in 1989 and 1990.

---

[1]    Of the total deficiencies determined, $9,023 for 1989 and $9,414 for 1990 are alternative minimum tax under sec. 55; the remaining amounts are income tax under sec. 1.

Unless indicated otherwise, all section and subtitle references are to sections and subtitles of the Internal Revenue Code of 1986, as in effect for the years in issue.

[2]    The parties reached the following agreements.  For 1989, if respondent's determination is sustained, then (1) petitioners may claim a Schedule C expense deduction in the amount of $15,551 (see sec. 62(a)(2)), (2) petitioners may claim on Schedule C cost of goods sold in the amount of $8,260, (3) petitioners may claim a net (i.e., after subtracting 2 percent of adjusted gross income) Schedule A business expense deduction in the amount of $58,469, and (4) petitioners may claim a Schedule A medical expense deduction in the amount of $615.23.  For 1990, if respondent's determination is sustained, then (1) petitioners may claim a Schedule C expense deduction in the amount of $10,270, (2) petitioners may claim a Schedule A interest expense deduction in the amount of $109, and (3) petitioners may claim a net Schedule A business expense deduction in the amount of $68,110.

FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, petitioners resided in Urbandale, Iowa.

Background

Beginning in 1969, and during the years in issue, Hathaway was a traveling sales representative for The Apparel Group, Ltd., and its predecessor companies. Enro Shirt Co., Inc., Damon Creations, Inc., and Carnegie Creations d/b/a B.D. Baggies were part of The Apparel Group, Ltd. The term TAG will be used hereafter to apply to the Apparel Group, Ltd., its predecessors, and its constituents, or any of them. Petitioner Brenda J. Hathaway did not work outside the home in 1989 and 1990.

During the years in issue, TAG was in the business of manufacturing clothing, wholesale distribution and warehousing of domestic and imported men's clothing, and retail sales of clothing. Hathaway was a traveling sales representative in wholesale distribution of men's clothing to retail customers, and was employed by TAG to work for an indefinite period of time.

Hathaway's fall sales season began in mid-January and ran through mid-June. His spring sales season began in mid-August and ran through the end of November.

During the years in issue, TAG had about 23 sales representatives. TAG hired only professional, experienced sales representatives and had a very low turnover rate for sales representatives. Most of TAG's sales representatives had been with TAG for more than 20 years.

TAG assigned sales territories to its sales representatives. These sales territories were exclusive. If a sales representative other than the one assigned to a territory made a sale in that territory, then the sales representative to whom the territory was assigned would receive the commission for that sale. Before 1990, Hathaway's assigned sales territory was Kansas, Nebraska, and Iowa.[3] Early in 1990, Hathaway's sales territory was expanded to include North and South Dakota, Wyoming, and about 70 percent[4] of Minnesota. Hathaway effectuated most of his sales when traveling in this territory.

---

[3] Before TAG hired Hathaway, Hathaway was living in Lexington, Kentucky, and was another company's sales representative for Kentucky and southern Indiana. Hathaway originally was expected to replace either TAG's southern California sales representative or TAG's Seattle, Washington, sales representative. However, when Hathaway came on board, TAG's Oklahoma sales representative was ill. Hathaway was assigned to learn the Oklahoma territory, and the southern California and Seattle plans were scratched. After the previous Oklahoma sales representative died, that man's brother, who had the Iowa territory, was asked to take over Oklahoma and Hathaway was asked to take over Iowa.

[4] The parties stipulated that Hathaway's assigned sales territory included 60 percent of Minnesota. Our finding, contrary to the stipulation, is in accord with Hathaway's trial testimony, which was not objected to at the trial. This factual point does not affect our analysis or conclusions.

He also maintained showrooms, see infra, where he solicited sales.

During the years in issue, TAG did not require its sales representatives to use particular sales techniques or to use specific materials in making sales presentations or finding customers. TAG did not give any sales training to Hathaway during the years in issue, or at any previous time. TAG sales representatives used their own creativity and experience to create sales. TAG did not have the right to change the method by which its sales representatives solicited sales. TAG did not mandate the time during which its sales representatives were to solicit sales or the portion of their assigned territories on which they were to concentrate; sales representatives used their own business judgment regarding the scheduling of their time. TAG did not provide leads on prospective customers to its sales representatives; sales representatives were not required to pursue or report on leads. Most of Hathaway's customer base was generated through his efforts; there were very few TAG customers in the Iowa-based territory when Hathaway took it over in 1969.

TAG had two sales meetings each year and encouraged, but did not require, its sales representatives to attend those sales meetings.

### Sales Procedure Manual

TAG provided a sales procedure manual to its sales representatives. The sales procedure manual details the way in

which orders are to be placed with TAG, but does not describe the manner in which sales representatives are to solicit sales.

In 1970 or 1971, when there was a change in TAG's ownership, a sales procedure manual was given to Hathaway. Parts of the sales procedure manual were revised from time to time. The version of the sales procedure manual that was in effect during the years in issue was last revised in January 1984. Hathaway did not consult the sales procedure manual from about January 1984, until well after the end of the years in issue.

The sales procedure manual states that sales representatives are asked to submit their schedules, and must submit their vacation requests, to the national sales manager. However, these provisions were not followed by TAG's sales representatives, nor were these requirements enforced by TAG. The sales procedure manual also states that sales representatives are not authorized to accept cancellations of orders or agree to returns, and that TAG reserves the right to refuse any return that does not have an authorized return sticker. In practice, however, TAG accepted their sales representatives' recommendations as to cancellations and returns.

## Communication With TAG

Hathaway communicated to TAG the orders he had solicited by writing these orders on a scratch pad, then forwarding the

scratch pad entries to his order writers.  The order writers then documented the orders on forms provided by TAG, and sent the forms to TAG.  When a TAG sales representative opened a new account, the sales representative was required to fill out a credit report for that prospective customer.  TAG sales representatives were not required to submit to TAG any other types of reports.

Apart from placing orders, Hathaway communicated with TAG on an irregular basis; he spoke to TAG's comptroller and national sales manager primarily when he had a problem with a customer.  Hathaway also called on TAG's national sales manager, for example, to meet with a potential customer's upper-level management when he closed a contract with a major company.  TAG's national sales manager had final approval when a special arrangement with respect to price, service, or advertising was requested by a major company.  Events such as these might cause Hathaway to communicate with TAG as often as three times in a week, or as rarely as once a month.

### Compensation and Benefits

TAG paid its sales representatives on a commission basis, calculated on the amount and cost of merchandise shipped by TAG, not based on the orders a sales representative placed with TAG.  The commissions a sales representative earned were put into a reserve.  TAG then paid its sales representatives a draw against the previously earned commissions in the reserve on a semimonthly

basis.  On a semiannual basis, August 15 and February 15, any commissions exceeding the draw, less items bought from TAG, see table infra p. 11, were paid to the sales representative.  In the rare situation when a sales representative had not earned any commissions, and thus would not have any commissions in reserve, that sales representative ordinarily would not receive a semimonthly draw.

TAG issued to Hathaway Forms W-2 showing compensation paid in the amounts of $102,837.28 and $129,283.50 for 1989 and 1990, respectively.  TAG withheld Federal income taxes and Social Security (F.I.C.A.) taxes from these amounts.  TAG also issued to Hathaway Forms 1099 showing noncash items provided by TAG in the amounts of $23,277.56 and $19,219.11 for 1989 and 1990, respectively.  See table infra p. 11.

Hathaway participated in TAG's pension plan and TAG provided to Hathaway long-term disability insurance and life insurance, all fully funded by TAG.  TAG also funded two-thirds of his medical insurance benefits.

Expenses

During the years in issue, Hathaway and TAG's other sales representatives were responsible for paying their own expenses for traveling, lodging, telephone, and food.  However, TAG paid part of Hathaway's moving expenses in 1969 when he relocated to Iowa.  See supra note 3.  TAG, TAG sales representatives, and retail distributors of TAG merchandise shared the expense of

advertising. TAG provided its sales representatives with order forms, swatch cards, and envelopes preaddressed to TAG; TAG did not supply its sales representatives with any other materials or equipment, nor did TAG reimburse its sales representatives for business-related expenses. Hathaway spent about $1,500-$2,200 per year for all of his "tools of the trade", such as sample cases, hanging bags, traveling racks, business cards, and stationery.

Hathaway incurred the costs of maintaining business quarters, one located at his home in Iowa and another at the Hyatt Regency Mart in Minneapolis, Minnesota. He invested about $18,500 to build and furnish a 650-square-foot dual-purpose office and showroom onto his house. In the showroom, Hathaway had forms, display tables, and full glass racks. He used the showroom to display TAG's merchandise to customers in Iowa. In the office, Hathaway had a desk, computer and printer tables, bookshelf system, computer, printer, fax machine, copy machine, and filing cabinets. During the last 6 months of 1990, Hathaway sublet showroom and office space in the Hyatt Regency Mart in Minneapolis from another TAG sales representative at a rate of $315 per month. He spent about $8,500 to outfit the Minneapolis facility with display and office equipment. On November 26, 1990, Hathaway entered into a direct lease of a suite in the same Minneapolis facility, for a term from January 20, 1991, through August 31, 2000.

Hathaway incurred the cost of going to 22 apparel shows per year, where he displayed TAG merchandise and solicited orders. These apparel shows cost Hathaway between $250-$600 per show for showroom rental fees and promoters' fees. Hathaway's total costs, including hiring assistants to help set up displays, may have run to $2,000 for some shows. Hathaway also paid $75 per year to be a member of the Bureau of Wholesale Sales Representatives. Membership in this organization was required in order to participate in certain apparel shows.

TAG's sales representatives also incurred the cost of hiring people to assist them in their sales activities. During the years in issue, Hathaway employed order writers and people to assist him at apparel shows. TAG knew that their sales representatives hired assistants and encouraged their sales representatives to do so; however, TAG did not screen assistants hired by their sales representatives.

Hathaway spent a total of $84,763 and $84,847 for these business expenses in 1989 and 1990, respectively.

In addition to the above expenses, Hathaway bought sales materials and equipment from TAG. TAG then deducted the costs of those items from the commissions that TAG paid to Hathaway on a semiannual basis, and TAG issued to Hathaway Forms 1099 in the amounts of these costs. The following table lists the costs of items Hathaway bought from TAG in 1989 and 1990.

1989

| Item | Enro | B.D. Baggies |
|---|---|---|
| Samples | $13,748.68 | $5,305.07 |
| Co-op Advertising | 2,526.28 | -- |
| Sales Aids | -- | 1,006.15 |
| Sample Insurance | 100.00 | -- |
| Office Supplies | 21.50 | -- |
| Swatch Book | 288.00 | -- |
| Personal Invoices | 109.68 | 172.20 |
| Total | | 23,277.56 |

1990

| Item | Enro/Damon | Neckwear | B.D. Baggies |
|---|---|---|---|
| Samples | $10,791.65 | $1,229.41 | $5,915.87 |
| Co-op Advertising | 237.60 | -- | 105.61 |
| Sample Insurance | 225.00 | -- | -- |
| Swatch Book | 288.00 | -- | -- |
| Mdse Giveway | 185.80 | -- | -- |
| Johnston Chargeback | 117.00 | -- | -- |
| Billonier's Label Charge | -- | 123.17 | -- |
| Total | | | 19,219.11 |

Hathaway ran the risk of incurring a loss. As explained supra, TAG sales representatives' commissions were a function of what TAG shipped, as opposed to orders placed. Thus, if the costs a TAG sales representative incurred in soliciting sales were greater than the commissions generated, because for whatever reason an order was not shipped, then that sales representative operated at a loss. TAG did not reimburse its sales representatives for such losses.

A TAG sales representative also could incur a loss as the result of guaranteeing an account. As explained supra, TAG sales representatives were required to submit to TAG credit reports on prospective customers. TAG then checked the prospective customer's credit history, and if favorable, extended credit to

that customer, bore any risk of loss, and received payment on the account. On some occasions TAG asked Hathaway if he would be willing to guarantee a prospective customer's credit. Over the years, there were three occasions when Hathaway guaranteed a prospective customer's credit and payment was not forthcoming; Hathaway had to bear the losses resulting from his guarantees.

### Sales For Other Companies

Some of TAG's sales representatives also handled lines of merchandise from other companies. TAG knew that some of its sales representatives handled other lines of merchandise, but did not actively discourage this practice. Sales representatives for TAG, however, were permitted to handle other manufacturers' lines of merchandise only if those lines did not conflict with any line of TAG merchandise. TAG management made the decision as to whether a line of merchandise was conflicting.

In 1989 and 1990, while Hathaway was a sales representative for TAG, he also handled a gloves line for Gates-Mills, Inc., for which he received commissions in the amounts of $14,693.94 and $5,000 in 1989 and 1990, respectively. Gates-Mills, Inc., is unrelated to TAG. TAG knew that Hathaway handled the sale of apparel for other manufacturers.

### Termination

TAG could have terminated Hathaway's position as a sales representative at any time. Likewise, Hathaway could have terminated his position with TAG at any time. However, if a

sales representative terminated his or her services, or if TAG dismissed a sales representative, then that sales representative would receive commissions on only 85 percent of that sales representative's as-yet-unshipped orders. TAG retained the commissions on 15 percent of unshipped orders to cover the cost of orders that may be held back for credit reasons, or for any other reason the order might be unshippable.

### Tax Returns

Petitioners filed initial and amended joint tax returns for 1989 and 1990. On their initial 1989 and 1990 tax returns, petitioners reported most of Hathaway's TAG sales representative expenses as employee business expenses itemized on Schedule A. Petitioners filed their amended 1989 and 1990 tax returns on July 17, 1991. On these amended tax returns, petitioners shifted the business expenses from Schedule A to Schedule C and explained as follows: "TAXPAYER, PAUL E. HATHAWAY, IS A FULL-TIME TRAVELLING SALESMAN AS DESCRIBED IN SECTION 3121(d)(3) OF THE INTERNAL REVENUE CODE AND HE IS THEREFORE NOT AN EMPLOYEE FOR PURPOSES OF SECTIONS 62 AND 67."

TAG withheld $3,604.80 and $3,924.45 as F.I.C.A. taxes from the commission compensation TAG paid to Hathaway for 1989 and 1990, respectively. Petitioners did not show any self-employment tax liabilities on their initial 1989 and 1990 tax returns. Sec. 1402(b)(1).

### ULTIMATE FINDING OF FACT

Hathaway was an independent contractor in 1989 and 1990.

OPINION

Hathaway's status as either an independent contractor,

statutory employee, or common law employee determines whether

petitioners properly deducted all of Hathaway's trade or business

expenses "above the line" (sec. 62(a)(1)[5], as in petitioners'

---

[5]     Sec. 62(a) provides, in pertinent part, as follows:

SEC. 62.   ADJUSTED GROSS INCOME DEFINED.

    (a) General Rule.--For purposes of this subtitle
[subtitle A, income taxes], the term "adjusted gross income"
means, in the case of an individual, gross income minus the
following deductions:

        (1) Trade and business deductions.--The deductions
    allowed by this chapter * * * which are attributable to
    a trade or business carried on by the taxpayer, if such
    trade or business does not consist of the performance
    of services by the taxpayer as an employee.

        (2) Certain trade or business deductions of
    employees.--

        (A) Reimbursed expenses of employees.--The
    deductions allowed by part VI (section 161 and
    following) which consist of expenses paid or
    incurred by the taxpayer, in connection with the
    performance by him of services as an employee,
    under a reimbursement or other expense allowance
    arrangement with his employer.  The fact that the
    reimbursement may be provided by a third party
    shall not be determinative of whether or not the
    preceding sentence applies.

        (B) Certain expenses of performing artists.--
    The deductions allowed by section 162 which
    consist of expenses paid or incurred by a
    qualified performing artist in connection with the
    performances by him of services in the performing
    arts as an employee.

                                        (continued...)

amended tax returns), or whether petitioners are required to deduct substantially all of those expenses (see supra note 2) "below the line", as in petitioners' initial tax returns. See sec. 62(a)(2). More than 80 percent of the deficiencies in dispute in the instant case results from the impact of this issue on the calculation of the alternative minimum tax. Sec. 56(b)(1)(A)(i); see supra note 1. Substantially all the remainder of the deficiencies results from the application of the 2-percent floor on miscellaneous itemized deductions. Sec. 67. Unlike the usual situation in employment-status cases, respondent does not contend, even in the alternative, that Hathaway is subject to self-employment taxes. Sec. 1401.

Petitioners contend that Hathaway was a statutory employee under section 3121(d)(3)(D) in 1989 and 1990, and thus, by operation of Rev. Rul. 90-93, 1990-2 C.B. 33, petitioners properly reflected Hathaway's business-related income and expenses on Schedule C in calculating adjusted gross income under section 62(a)(1). In the alternative, petitioners contend that Hathaway was an independent contractor in 1989 and 1990, also entitling petitioners to use Schedule C to reflect Hathaway's business-related income and expenses in calculating adjusted gross income under section 62(a)(1).

[5](...continued)

Respondent contends that Hathaway was a common law employee in 1989 and 1990, and thus was required to report his income as wages and to deduct allowable expenses as itemized deductions subject to the limitations of section 67.

We agree with petitioners that Hathaway was an independent contractor.

Although paragraphs (1) and (2) of section 62(a) make the income tax treatment of a taxpayer's trade or business expense deductions depend on whether the taxpayer is "perform[ing] * * * services * * * as an employee", subtitle A does not define "employee". Under these circumstances, we apply common law rules to determine whether an individual is an employee. Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323-325 (1992); Weber v. Commissioner, 103 T.C. 378, 386 (1994), affd. 60 F.3d 1104 (4th Cir. 1995). In making this determination, we look to the general common law of agency and not the law of any particular State. Nationwide Mut. Ins. Co. v. Darden, 503 U.S. at 323 n.3 (citing with approval Community for Creative Non-Violence v. Reid, 490 U.S. 730, 740 (1989)).

Whether a taxpayer is an independent contractor or a common law employee is a question of fact, Wolfe v. United States, 570 F.2d 278, 281-282 (8th Cir. 1978); Weber v. Commissioner, 103 T.C. at 386, or a mixed question of fact and law. Professional & Executive Leasing, Inc. v. Commissioner, 862 F.2d 751, 753 (9th Cir. 1988), affg. 89 T.C. 225 (1987).

Petitioners have the burden of proving error in respondent's notice of deficiency determination that Hathaway was a common law employee. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933); <u>Professional & Executive Leasing, Inc. v. Commissioner</u>, 89 T.C. at 231.

Among the relevant factors in determining the nature of an employment relationship are the following: (1) The degree of control exercised by the principal over the details of the work; (2) which party invests in the facilities used in the work; (3) the taxpayer's opportunity for profit or loss; (4) the permanency of the relationship between the parties to the relationship; (5) the principal's right of discharge; (6) whether the work performed is an integral part of the principal's business; (7) what relationship the parties believe they are creating; and (8) the provision of benefits typical of those provided to employees. <u>NLRB v. United Insurance Co.</u>, 390 U.S. 254, 258-259 (1968); <u>Professional & Executive Leasing, Inc. v. Commissioner</u>, 862 F.2d at 753, 89 T.C. at 232; <u>Weber v. Commissioner</u>, 103 T.C. at 387; <u>Simpson v. Commissioner</u>, 64 T.C. 974, 984-985 (1975).[6] No one

_____

[6] In self-employment tax cases we apply common law principles to determine whether the taxpayer is an employee because the statute directs us to do so. Sec. 1402(d); sec. 3121(d)(2); <u>Simpson v. Commissioner</u>, 64 T.C. 974, 984 (1975). The instant case is not a self-employment tax case; rather, it is a sec. 62(a) case. See <u>supra</u> text at note 5. Sec. 62(a) does not involve a statutory instruction to use common law principles. We use common law principles in the instant case for the reasons explained by the Supreme Court in <u>Nationwide Mut. Ins. Co. v.</u>
(continued...)

factor is determinative; rather, all the incidents of the relationship must be weighed and assessed.  <u>Nationwide Mut. Ins. Co. v. Darden</u>, 503 U.S. at 324; <u>NLRB v. United Insurance Co.</u>, 390 U.S. at 258; <u>Azad v. United States</u>, 388 F.2d 74, 76 (8th Cir. 1968); <u>Weber v. Commissioner</u>, 103 T.C. at 387.

## A.  Degree of Control

The principal's right to control the manner in which the taxpayer's work is performed ordinarily is the single most important factor in determining whether a common law employment relationship exists.  <u>Azad v. United States</u>, 388 F.2d at 76; <u>Leavell v. Commissioner</u>, 104 T.C. 140, 149 (1995); <u>Weber v. Commissioner</u>, 103 T.C. at 387.  In order for a principal to retain the requisite control over the details of a taxpayer's work, the principal need not stand over the taxpayer and direct every move made by that person.  <u>Weber v. Commissioner</u>, 103 T.C. at 388; <u>Professional & Executive Leasing, Inc. v. Commissioner</u>, 89 T.C. at 234; <u>Simpson v. Commissioner</u>, 64 T.C. at 985.  In

---

[6](...continued)
<u>Darden</u>, 503 U.S. 318, 323-325 (1992).  Thus, <u>Darden</u> and <u>Simpson</u>, illustrate two different routes, applicable to different types of cases, that lead to the same result--that is, that common law principles are to be used to determine whether a person is an employee, in both sec. 62(a) cases and self-employment tax cases. Once we arrive at the conclusion that common law principles are to be used in the instant sec. 62(a) case, it is evident that the self-employment tax statute is in pari materia with sec. 62(a) for this purpose and it is appropriate to use self-employment tax case opinions in the instant case to analyze what common law principles mean as applied to the question of whether an individual is a common law employee.

addition, the degree of control necessary to find employee status varies according to the nature of the services provided. Weber v. Commissioner, 103 T.C. at 388. Finally, we must consider not only what actual control is exercised, but also what right of control exists as a practical matter. Professional & Executive Leasing, Inc. v. Commissioner, 862 F.2d at 754, 89 T.C. at 233-234; Weber v. Commissioner, 103 T.C. at 387-388.

TAG did not control, or have the right to control, the manner in which Hathaway conducted his sales activities, the means by which Hathaway solicited sales, or the results to be obtained. TAG did not require its sales representatives to use particular sales techniques or specific materials in making sales presentations or finding customers. TAG did not provide sales training or require its sales representative to attend sales meetings. TAG's sales representatives were left entirely to their own devices with respect to the manner in which they solicited sales and the scheduling of their time. TAG did not provide leads to its sales representatives, nor did TAG require its sales representatives to pursue or report on leads. Importantly, TAG did not have the right to change the method by which its sales representatives solicited sales.

TAG did not require reports from its sales representatives, nor did TAG prohibit its sales representatives from carrying other, non-conflicting lines of merchandise. See Simpson v. Commissioner, 64 T.C. at 987. Sales representatives hired

assistants at their own discretion and incurred the cost of paying those assistants.

Respondent overstates the role of the sales procedure manual, contending that the sales procedure manual dictates the manner in which sales representatives are to carry out their sales activities. The sales procedure manual details the procedure for submitting orders to TAG; it does not provide direction with respect to the manner in which TAG's sales representatives are to solicit sales.

We recognize that the sales procedure manual states that sales representatives are to submit their schedules and vacation requests to the national sales manager; however, these requirements are toothless, as they are not followed by TAG sales representatives, nor are they enforced by TAG. Hathaway testified that the requirement that sales representatives submit their 4-week schedules every 2 weeks to the national sales manager is unworkable, as he usually is not able to predict where he is going to be in a given week. These requirements also lack substance in light of the fact that sales representatives use their own business judgment with respect to the scheduling of their time and the fact that sales representatives occasionally miss sales meetings because they are on vacation. Further, even if these requirements were followed and enforced, they would not represent control by TAG with respect to the manner or means by which sales representatives solicit sales.

Likewise, even if TAG enforced the requirements that sales representatives not accept unauthorized cancellations or agree to returns, those requirements would not represent control by TAG with respect to the manner or means by which its sales representatives solicited sales.  In those respects the sales procedure manual's statements on cancellations and returns are parallel to the sales manual's instructions for the placing of orders with TAG.

We reject respondent's contention that Hathaway was under the supervision of TAG's national sales manager.  The national sales manager's role was not so much to supervise sales representatives as it was to be a status representative for TAG when dealing with the upper-level management of major companies or when a sales representative had a problem with a customer.  TAG's national sales manager facilitated sales, he did not supervise or direct the sales activities of TAG's sales representatives.

We also reject respondent's contention that TAG's assignment of exclusive sales territories to its sales representatives represents control by TAG.  At least part of the reason that the sales territories were exclusive was to protect each sales representatives' earning capacity, and thus support the profits of TAG.

TAG's lack of control and lack of right to control the manner and means by which Hathaway solicited sales strongly support a finding that Hathaway was an independent contractor, not an employee of TAG.

B.  Investment in Facilities and Sales Materials and Equipment

Hathaway made a substantial investment in facilities and bore substantially all the expenses of his sales activities.  The record is not clear with respect to when the investment was made, but Hathaway spent about $18,500 to build and furnish a dual-purpose office and showroom onto his house.  Hathaway spent about $10,000 in 1990 to rent and outfit a showroom in Minneapolis.  Hathaway spent $84,763 in 1989 and $84,847 in 1990 for sales material and equipment, his business quarters, apparel shows, and assistants.  In addition, Hathaway bought $23,277.56 and $19,219.11 worth of sales material and equipment from TAG in 1989 and 1990, respectively.  See table supra p. 11.  TAG did not reimburse Hathaway for any of these expenses.  TAG provided to Hathaway minimal supplies, specifically order forms, swatch cards, and envelopes preaddressed to TAG.

Hathaway's substantial investment in facilities and sales material and equipment, especially relative to the minimal supplies provided by TAG, supports a finding that Hathaway was an independent contractor, not an employee of TAG.

C.  Opportunity For Profit or Loss

Hathaway ran the risk of incurring a loss as the result of his sales activities.  As explained supra, if a sales representative incurred expenses to solicit sales and for some reason the orders placed were unshippable, then the sales representative would suffer a loss.  TAG did not reimburse its sales representatives for such losses.  A TAG sales representative also could suffer a loss as the result of guaranteeing the credit of a customer who failed to make payments.

This factor supports a finding that Hathaway was an independent contractor, not an employee of TAG.

D.  Permanency of the Relationship

Hathaway had been a TAG sales representative since 1969 and was hired by TAG to work for an indefinite period of time.  Most of TAG's sales representatives had been with the company for over 20 years.

The permanency of the relationship between TAG and TAG's sales representatives would support a finding that Hathaway was an employee of TAG.

E.  TAG's Right of Discharge

The relationship between Hathaway and TAG was terminable at the will of either party.  Some opinions regard this as an indicator of employee status.  However, it is not clear in the context of the instant case that TAG would not have the same

right to discharge an independent contractor. Thus, this element appears to be of little significance in the instant case.

## F.  Integral Part of Business

TAG is in the business of wholesale distribution of domestic and imported men's clothing. TAG's sales representatives are TAG's key connection with its customers. This factor would support a finding that Hathaway was an employee of TAG.

## G.  Relationship TAG and Hathaway Believed They Had Created

Hathaway and Arthur Penn, who had been a TAG sales representative for 29 years and TAG's national sales manager and senior vice president for 3 years, testified that as sales representatives for TAG, they considered themselves independent contractors, not employees of TAG. Hathaway's testimony, however, is contradicted by the fact that petitioners initially reported most of Hathaway's business expenses on Schedule A.

A letter dated March 1, 1990, written by TAG's controller, Theresa Hinton, indicates that she was told by Rita Shumate, head of TAG's auditing department, that Hathaway was an employee. However, a letter dated March 21, 1990, also written by Theresa Hinton, indicates that for the first quarter of 1987, TAG considered Hathaway an "independent agent". TAG issued to Hathaway Forms W-2 and withheld Federal income taxes and F.I.C.A. taxes from his commissions. The withholding of subtitle C taxes by TAG on behalf of Hathaway is consistent with a finding that

Hathaway was an employee of TAG.  <u>Azad v. United States</u>, 388 F.2d at 78; <u>Weber v. Commissioner</u>, 103 T.C. at 392.

Notwithstanding Hathaway's and Arthur Penn's testimony and Theresa Hinton's March 21, 1990, letter, the bulk of the evidence on this factor points to the conclusion that TAG and Hathaway believed that they had created a employer-employee relationship. This factor would support a finding that Hathaway was an employee of TAG.

H.  <u>Provision of Employee-Type Benefits</u>[7]

Hathaway participated in TAG's pension plan and TAG provided to Hathaway long-term disability insurance and life insurance. TAG also funded two-thirds of Hathaway's medical insurance benefits.

The provision of these benefits would support a finding that Hathaway was an employee of TAG.  <u>NLRB v. United Insurance Co.</u>, 390 U.S. at 259; <u>Azad v. United States</u>, 388 F.2d at 78; <u>Weber v. Commissioner</u>, 103 T.C. at 393-394.

I.  Conclusion

The relationship between Hathaway and TAG had aspects that were characteristic of an employer and an employee and others

---

[7]  On opening brief, respondent contends, for the first time, that if Hathaway is not a common law employee, then the value of any benefits provided by TAG to Hathaway would be taxable as income to Hathaway.  This matter has not been properly pleaded, and, thus, we shall not consider it here.  <u>Markwardt v. Commissioner</u>, 64 T.C. 989, 997-999 (1975).

characteristic of a principal and an independent contractor. After weighing the above factors, giving particular weight to (1) the lack of control, and lack of right to control, that TAG had over its sales representatives, and (2) Hathaway's substantial investments and unreimbursed expenses, we conclude that Hathaway was an independent contractor, and not a common law employee in 1989 and 1990.

We hold for petitioners on this issue.

In Rev. Rul. 90-93, 1990-2 C.B. 34, respondent announced the position that a person described in section 3121(d)(3), commonly referred to as a "statutory employee", is "not an employee for purposes of sections 62 and 67." The parties cast much of their presentation in terms of section 3121(d)(3). Because of our determination that in 1989 and 1990 Hathaway was an independent contractor for purposes of section 62(a), Hathaway's trade or business expenses are deductible "above the line" on Schedule C, and need not be relegated to Schedule A. This result would not be changed no matter how we were to rule on the section 3121(d)(3) issue, and so we decline to rule on that issue in the instant case.

To take account of the parties' agreements,

Decision will be entered

under Rule 155.
